Lloyd E. SCHLUP, Appellant,

v.

Paul K. DELO, Appellee.

No. 93–3272.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 3, 1993.

Decided Nov. 15, 1993.

Order Denying Suggestion for
Rehearing En Banc and Motion
for Stay Nov. 17, 1993

Sean D. O'Brien of the Missouri Capital Punishment Resource Center, argued, Kansas City, MO, for appellant.

Frank A. Jung, Asst. Atty. Gen., Jefferson City, MO, argued for appellee.

Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Lloyd Eugene Schlup, a Missouri death-row inmate, requests a stay of execution and reversal of the district court's judgment denying his second petition for a writ of habeas corpus under 28 U.S.C. § 2254. The district

court[1] dismissed Mr. Schlup's second petition on August 23, 1993, and denied his subsequent Fed.R.Civ.P. 59(e) motion to set aside the dismissal order. The district court's final ruling came on September 13, 1993, and Mr. Schlup's appeal and motion for a stay of execution pending the resolution of his appeal followed.

The district court dissolved its stay of execution on September 15, 1993, in conjunction with its final rulings on the second petition. After a hearing, we denied the motion for stay pending appeal. *Schlup v. Delo,* No. 93–3272, 1993 WL 409815, 1993 U.S.App. LEXIS 26748 (8th Cir. Oct. 15, 1993). We now vacate that opinion and consider a renewed request for stay and the merits of Mr. Schlup's appeal.

In support of his second petition for habeas relief, this appeal, and the renewed request for stay of execution, Mr. Schlup tendered to the district court and now tenders to this court several affidavits and statements, mostly from present or former prisoners, purporting to be newly discovered evidence tending to establish that he was not present at the scene of the murder for which he was sentenced to death. He also renews his reliance on a videotape, offered at trial as part of an alibi defense, showing his presence in the dining room near the time of the murder. In other words, appellant says he could not have been present at the assault and is actually innocent of the crime.

## I.

 In his second petition, Mr. Schlup asserts a number of constitutional claims not raised, or raised and denied in his first petition. Thus, these allegations constitute either successive or abusive uses of the writ, 28 U.S.C. § 2244(b), and may be considered by this court only under limited circumstances. *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992).

Unless a habeas petitioner shows cause and prejudice, *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), a court may not reach the merits of:

(a) *successive claims* which raise grounds identical to grounds heard and decided on the merits in a previous petition, *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); (b) new claims, not previously raised which constitute an *abuse of the writ, McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); or (c) *procedurally defaulted claims* in which the petitioner failed to follow applicable state procedural rules in raising the claims. *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). These cases are premised on our concerns for the finality of state judgments of conviction, and the "significant costs of federal habeas review." *McCleskey, supra,* at 490–91, 111 S.Ct. at 1468; *see, e.g., Engle v. Isaac,* 456 U.S. 107, 126–128, 102 S.Ct. 1558, 1571–1572, 71 L.Ed.2d 783 (1982).

*Id.* (parallel citations omitted).

Mr. Schlup seeks to establish "cause and prejudice" or, in the alternative, seeks to establish his "actual innocence" of the crime as a means of obtaining federal court review of his constitutional claims. The district court reviewed and denied his cause and prejudice allegations. We agree with this result and adopt the well-reasoned opinion of the district court in this regard.

## II.

### A. Procedural Bar

 Under a second federal habeas review of a petitioner's state court conviction, a claim of actual innocence requires a dual analysis. First, we must consider Mr. Schlup's attempt to invoke the rule announced in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) that even if a petitioner cannot meet the cause and prejudice standard, a federal court may examine the merits of a constitutional claim if failure to do so would result in a miscarriage of justice. *Id.,* at 454, 106 S.Ct. at 2627. A petitioner "may make the requi-

---

1. The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

site showing by establishing that ... he has a colorable claim of factual innocence." *Id.* The contours of this qualification were more clearly delineated by the Supreme Court in *Sawyer v. Whitley,* which referred to the test as the miscarriage of justice or "actual innocence" exception. *Sawyer,* — U.S. at —, 112 S.Ct. at 2519.

In this context, actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins,* — U.S. —, —, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993). Thus, the question is: Has this appellant established "actual innocence" as defined by the Supreme Court? We think not, at least under the test this panel must apply.

*Sawyer* dealt with the punishment phase of the criminal proceeding as opposed to the guilt or innocence phase of the trial. Therefore, appellant argues, with some justification, that *Sawyer* announced only a test for analyzing the fairness of the death penalty portion of a trial. And, the Supreme Court did say, in *Sawyer,* with regard to guilt or innocence:

> Our standard for determining actual innocence was articulated in *Kuhlmann* as: "[T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.' "

*Sawyer,* — U.S. at —, 112 S.Ct. at 2519, n. 5 (citations omitted).

On the other hand, *Sawyer* says that "actual innocence" under the death penalty phase of a case must be determined by considering whether a "petitioner has shown by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty." *Id.,* at —, 112 S.Ct. at 2523. Says appellant, this seemingly higher (penalty) test is necessary because the amorphous concept of being actually "innocent of death"

requires a more objective standard. *Id.,* at —, 112 S.Ct. at 2519–20. In other words, in the context of guilt or innocence of the crime itself, the concept of "actual innocence" is easier to grasp. *Id.,* at —, 112 S.Ct. at 2520. Thus, the more subjective *Kuhlmann* test is sufficient.

Whatever the merits of appellant's contentions, we do not write on a clean slate. We must reject appellant's argument because in this circuit "the new standard [required by *Sawyer*] applies equally to challenges to a conviction, not just challenges to a death sentence." *McCoy v. Lockhart,* 969 F.2d 649, 651 (8th Cir.1992). And, the imprimatur of this court en banc was stamped on the *McCoy* holding in *Cornell v. Nix,* 976 F.2d 376 (8th Cir.1992) (en banc), *cert. denied,* — U.S. —, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993). Accordingly, we make our determination of whether Mr. Schlup's claim of actual innocence opens the gateway to our consideration of his constitutional claims on that basis.

Before reviewing the gateway evidence now advanced by Mr. Schlup, we consider the presence or absence of any constitutional error at the trial for which relief could be granted. The dissent contends that there was constitutional error in the form of "utter ineffectiveness of Schlup's trial counsel" and that but for this error "the jury would have received the full picture of Dade's murder, and if it were to credit the evidence, it would have no choice but to acquit." The dissent barely mentions that, although the district court found the claim of ineffective assistance to be procedurally barred, we disregarded this holding and considered the merits of this ineffective assistance claim in the appeal of Mr. Schlup's first petition for habeas relief. *Schlup v. Armontrout,* 941 F.2d 631, 638–42 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1273, 117 L.Ed.2d 499 (1992). We found that under the test announced in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), Mr. Schlup's counsel was not ineffective at either the guilt or penalty stages of the state trial proceeding. *Schlup,* 941 F.2d at 639. We see no reason to change this result even

if we consider the evidence Schlup now presents.

As at the first habeas, Mr. Schlup faults his counsel, Mr. Bushmann, for failing to sufficiently investigate the facts surrounding the murder of Arthur Dade. The dissent agrees. This allegation is erroneous and unfair.

There were three inmates involved in the murder. The three lawyers representing the accused worked together on parts of their investigations. Mr. Bushmann spearheaded the discovery and defense preparation. He arranged and participated in the taking of thirty-eight depositions including those of every guilt witness who testified at trial and who was directly related to the prison. It was Mr. Bushmann's persistence that confirmed the existence of the dining room videotape now used by Mr. Schlup in his effort to show actual innocence. Mr. Bushmann also determined through discovery that one hundred persons were interviewed by prison investigators and appears to have obtained, for review, the tapes or transcripts of all the statements resulting from these inquiries. The trials of the other inmates occurred prior to Mr. Schlup's trial and Mr. Bushmann claims to have reviewed the crucial portions of this trial testimony in preparation for Mr. Schlup's defense. The problem does not seem to be deficiencies in trial preparation by Mr. Bushmann but, rather, the changing nature of the information presented by some of the individuals present at or near the deadly assault.

At trial, as noted by the district court, two prison officials, who were eyewitnesses to the crime, positively identified Mr. Schlup as one of the three perpetrators of the murder. This evidence was clearly admissible and stands unrefuted except to the extent that Mr. Schlup now questions its credibility. Witnesses' credibility, however, is an issue reserved for the trial jury. It is not a matter within the province of the district court or of this court in a habeas proceeding. Federal habeas, as explained in *Herrera*, does not provide a forum for the retrial of a convicted felon. *Herrera v. Col-*

*lins*, —— U.S. ——, 113 S.Ct. 853, 860–61, 122 L.Ed.2d 203 (1993). So, even if we disregard the source of the new evidence, the eleventh-hour nature of the information, and a presentation coming almost six years after the trial; it is simply not possible to say that the appellant has shown by clear and convincing evidence that but for a constitutional error no reasonable jury would have found him guilty. Therefore, there is no basis for sustaining the motion for stay, *Delo v. Blair*, —— U.S. ——, 113 S.Ct. 2922, 125 L.Ed.2d 751 (1993), or for reversing the district court.

Even so, we will discuss the "newly discovered" evidence presented by Mr. Schlup. This information comes in the form of written statements, affidavits, and a timed analysis of the videotape taken in the dining room. We have now heard oral argument on these matters twice.

The major thrust of Mr. Schlup's purported showing of actual innocence involves his alibi defense. Through use of the videotape, timed on a second-by-second basis, Mr. Schlup claims that he could not have been at the murder scene. He was, he claims, in the dining room at the time.

Mr. Schlup primarily relies upon two affidavits, one from a former prisoner and one from a former employee at the institution.[2] The latter document is dated October 26, 1993, eight days before we heard oral argument on the merits of this appeal.

John L. Green, an inmate at the Missouri Prison in Jefferson City at the time of the murder, in an affidavit dated September 7, 1993, states that he was "standing near Sergeant Flowers" at the lever box that opens the cells to unit 5A and from such position saw the murder. He further says that Sergeant Flowers directed him to call "base" to report the fight and that he immediately went into the office and made the call.

In conjunction with this new information, the affidavit of Robert Faherty, a former lieutenant at the prison, is presented. He places Mr. Schlup in his presence in a corridor to the dining hall for a two and a half to

---

2. At oral argument, the state contended that the employee was discharged. The petitioner claims

he retired. We find nothing in the record either way.

three-minute period as Mr. Schlup proceeded from housing unit 5A, the location of the murder, to the dining hall.

The videotape is then presented to show Mr. Schlup arriving at the dining hall first in line. According to the videotape, the corrections officers depart from the hall one minute and five seconds later, purportedly as a result of a call from "base" reporting the assault. This, Mr. Schlup contends, shows that he had left the housing unit before the assault occurred. Since Mr. Schlup arrived, according to Mr. Faherty's calculation, at least three and a half to four minutes after leaving the housing unit, and, the assault occurred, according to Mr. Green's statement and the videotape, one and a half to two minutes prior to his arrival at the dining room, Mr. Schlup has an alibi. This was the same defense Mr. Bushmann attempted to establish at trial.

However, Mr. Green has made two prior statements. He told prison investigators that on February 3, 1984, the day of the murder, he was in the office at the housing unit, not next to Sergeant Flowers at the lever box some distance away, and that he did not observe the murder at all. He did state that he called "base" for help but on a different timing sequence. Of more importance is Mr. Green's testimony under oath at the Rodnie Stewart trial. Mr. Stewart was accused, along with Mr. Schlup and Mr. O'Neal, of the crime and was tried over a year prior to Mr. Schlup. On September 5, 1984, Mr. Green testified under oath that he was in the office, heard the words "fight-fight," "got up and ... went to the door [of the office]," could see Sergeant Flowers at the lever box, saw Dade running toward the office when Dade and Stewart collided and fell to the floor. Mr. Green said he saw no actual fight take place. He then testified that he went into the office to wait for further instructions. He made no mention in his testimony of calling "base." Thus, neither of these earlier presentations fully support Mr. Green's present statement. Indeed, there are crucial differences.

Also, Mr. Faherty has testified under oath on two prior occasions. His deposition was taken by Mr. Bushmann and the lawyers for Mr. O'Neal and Mr. Stewart on June 29, 1984, and he testified at Mr. Schlup's December 1985 trial. In both instances, Mr. Faherty has Mr. Schlup yelling out a window near the corridor to the dining room and then passing with the "first wave" of prisoners immediately into the dining room. Specifically, Mr. Faherty testified that he was temporarily on post at door T–3 located at the end of the corridor leading from the housing unit to the dining hall for only ten to fifteen seconds. At this location and during this time period, he saw Mr. Schlup yell out the window and told Mr. Schlup to move along toward the dining room which "he [Schlup] did." Mr. Faherty testified that he also immediately moved to the dining room after his ten to fifteen second stop at T–3 because the dining room was really his assigned post. By all accounts, the walking time from T–3 to the entrance of the dining room is no more than twenty-five to thirty seconds.

Also of importance, in this context, is the testimony of Sergeant Peoples who was manning "base" during the relevant time period. He testified without equivocation that it was Captain Eberle, one of the officers posted near the scene of the murder, and not prisoner Green, who called "base" with news of the stabbing. Peoples testified that he immediately broadcast an alarm to prison officers, including those in the dining room who are seen responding to the call on the videotape.

Thus, in the record and in the discovery, a much different timing sequence is established, one that provided Mr. Schlup ample time to participate in the murder and make his way to the dining hall. This was, of course, the state's theory at the trial and a theory compatible with the jury verdict.

██ With the recent Faherty statement, we are asked on appeal to consider evidence that the district court did not have an opportunity to pass upon. Further, Mr. Faherty testified in Mr. Schlup's trial, as indicated, so it cannot be said that his affidavit is newly discovered evidence as were the affidavits considered in *Herrera*. We must also observe that in a civil context dealing with a motion for summary judgment, we have held that we will not allow an affidavit in conflict with earlier sworn testimony to create an

issue of fact. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir.1983). We believe that the same rule should apply in the context of habeas litigation, a civil action.

While it is evident that there are some inconsistencies between Mr. Faherty's affidavit and his trial testimony, for the most part, the affidavit simply is an effort to embellish and expand upon his testimony given under oath in Mr. Schlup's trial. This is not the type of newly discovered evidence contemplated in *Herrera*, and presents an entirely different issue of whether some seven years after a trial the court should permit witnesses to come in and add to, modify, or embellish their earlier testimony. We believe that a habeas court should not permit retrial on such a basis.

The dissent also emphasizes other parts of Mr. Schlup's present version of the facts in its attempt to advance the probability that, but for his attorney's incompetence, no reasonable jury would have found Mr. Schlup guilty of the murder. Mr. Schlup purports to present eyewitnesses who either didn't see him at the assault or who now implicate another inmate, Randy Jordan.

The dissent picks and chooses from among Mr. Schlup's several new statements and affidavits, *see* dissent n. 1, and finds some of them incredible because they "are too inconsistent with" the statements from some of the other newly presented eyewitnesses. The dissent also ignores or minimizes and excuses contrary statements given by some of these same individuals when the crime was investigated prior to trial. Indeed, three of the new statements credited by the dissent, in addition to the Green affidavit, those by Lamont Griffin–Bey, Donnell White and James Pierce, are inconsistent with prior interviews given during the investigation of the crime. At that time, White and Pierce denied having witnessed the murder at all. As the dissent concedes, Griffin–Bey, who now

identifies Robert O'Neal and Rodnie Stewart and finds Mr. Schlup absent from the attack, stated at the time of the contemporaneous investigation that he didn't "know none of those dudes." And, later, he refused to further comment on what happened at the time of the murder.

Thus, Mr. Schlup, like Herrera, attempts to seek a federal court retrial of his state court prosecution and falls well short of showing "by clear and convincing evidence [that] no reasonable juror would find him [guilty of murder.]" *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2523.

## B. Due Process

The second prong of Mr. Schlup's "actual innocence" allegation requires our consideration of the claim as, itself, a constitutional violation. This requirement arises from the assumption by the Supreme Court in *Herrera* made for the sake of deciding that particular case, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, —— U.S. at ——, 113 S.Ct. at 869. This language is from Justice Rehnquist's opinion concurred in by Justices Scalia and Thomas. Justice O'Connor in her concurrence, joined by Justice Kennedy, compared and contrasted this language with that from Justice White's concurrence and Justice Blackmun's dissent, and stated that resolution of this issue assumed by Justice Rehnquist was neither necessary nor advisable in this case. She emphasized that such "federal proceedings and relief—if they are to be had at all—are reserved for 'extraordinarily high' and 'truly persuasive demonstrations of "actual innocence"' that cannot be presented to state authorities." *Id.*, at ——, 113 S.Ct. at 874.[3] The decisive issue in her

3. As the author of this opinion for the court, I express, separately, without the concurrence of Judge John R. Gibson, my belief that Mr. Schlup cannot, under the holding in *Herrera*, seek federal habeas relief based upon this "free standing" claim without first seeking executive clemency from the Governor of Missouri. It is my view

that in *Herrera*, at least five members of the Supreme Court (Chief Justice Rehnquist, Justices O'Connor, Kennedy, Scalia, and Thomas) would permit a federal habeas remedy based upon an "actual innocence" claim arising from newly discovered evidence rather than trial error (assuming such a remedy even exists when the question

concurrence as well as in Justice Rehnquist's opinion, was that the petitioner had failed to make a persuasive showing of actual innocence. Justice Rehnquist stated that the showing fell short of that which would have to be made to trigger the constitutional claim which he assumed existed.

*Herrera* points to the resolution of Schlup's claim. As we have just discussed in part II–A, when the new evidence itself is analyzed with its inconsistencies and weaknesses, and considered together with the evidence before the jury at the trial of the case, the extraordinarily high burden is not met, and there is no truly persuasive demonstration of actual innocence.

### III.

For the reasons stated above, we conclude that the motion for stay of execution should be denied and the order of the district court affirmed.

HEANEY, Senior Circuit Judge, dissenting.

Lloyd Eugene Schlup has presented truly persuasive evidence that he is actually innocent of the murder of his fellow inmate Arthur "Stump" Dade. Five eyewitnesses to the murder have provided sworn testimony that Schlup neither participated in the murder nor was present at the time. Both Schlup and his mother begged trial counsel (and subsequent counsel) to interview inmates housed in cells near the site of the murder, but none did so. Consequently their testimony was not heard by the jury that convicted Schlup and sentenced him to death. Moreover, their testimony has not been

heard in open court since the trial because neither the Missouri courts nor the federal courts have been willing to grant Schlup an evidentiary hearing in which this new evidence could be heard and evaluated. This truly persuasive evidence of his innocence allows Schlup to clear the court-imposed procedural hurdles and to address the merits of his claim that trial counsel was ineffective for failing to interview these eyewitnesses. The court errs today in not remanding this matter for an evidentiary hearing, as it did in ruling on Schlup's first petition, and I must therefore dissent.

### I

Schlup presents new evidence of his actual innocence of Dade's murder that is truly persuasive. The new evidence falls primarily into two categories. First, and most important, are the affidavits of eyewitnesses to Dade's murder which state unequivocally that Schlup was not present at and did not participate in Dade's murder. Second, Schlup presents new evidence that substantiates his videotaped alibi, *i.e.,* that he was in the dining room at the time of the murder.

### A

Schlup presents five affidavits of eyewitnesses to the murder, none of whom were contacted by Schlup's defense counsel, none of whom testified at trial, and all of whom appear willing to give their testimony in open court.[1] These witnesses describe firsthand the murder of "Stump" Dade, indicating unequivocally that Lloyd Schlup was not a perpetrator and was not even present. This testimony not only satisfies the threshold

reserved for future consideration is answered) only "if there were no state avenue open to process such a claim." *Herrera,* —— U.S. at ——, 113 S.Ct. at 869, 874. While Schlup argues that the word "process" included in the *Herrera* formulation by the five member majority means a state *court* proceeding, such an interpretation is untenable given the extensive discussion of executive clemency in both the opinion of the Court authored by Chief Justice Rehnquist and the concurrence written by Justice O'Connor. Indeed, Justice O'Connor, in her discussion of the "assume[d]" constitutional right, points out that the reserved question "may never require resolution at all" if "the safeguards

of clemency and pardon fulfill their historical mission." *Id.,* at ——, 113 S.Ct. at 874.

1. A number of other persons who stated that they were eyewitnesses to Dade's murder submitted affidavits or sworn testimony indicating that Schlup was not present at the time the murder occurred. I have not placed significant reliance on these statements either because the affiants indicate an unwillingness to testify at an evidentiary hearing or because the statements are too inconsistent with the statements of all of the other eyewitnesses (those newly presented by Schlup and those of the prosecution).

question of "actual innocence" but persuasively demonstrates the utter ineffectiveness of Schlup's trial counsel in failing to investigate the circumstances of Dade's murder.

John Green testifies by affidavit that while standing outside the unit clerk's office the morning of February 3, 1984, he witnessed Dade's murder:

> I looked down one walk, and I saw Randy Jordan holding Arthur Dade. Jordan was standing behind Dade, and had Dade's arms pinned to his sides from behind. I saw Robert O'Neal stab Dade several times in the chest while Jordan was holding him.
>
> * * *
>
> I never saw Lloyd Schlup at the scene of the crime....
>
> * * *
>
> If I had been contacted before Schlup's trial, I would have told his attorney that he was not there when Dade was stabbed....

Affidavit of John L. Green, at 2, 4, 6 (Sept. 7, 1993). O'Neal has been convicted for his role in Dade's murder, as has Rodnie Stewart, whom Green also saw on "one walk" at the time. Green has been out of prison since 1986, so contrary to the state's assertion he does have something to lose by perjuring himself. He nonetheless comes forward with persuasive evidence of Schlup's innocence, evidence never heard by the jury that sentenced Schlup to death, and he deserves to be heard in open court.[2]

Donnell White was walking to the dining room "very close to" "Stump" Dade when "three white guys" came from the opposite direction:

> One of them had a tumbler of something that he threw in Stump's face. One or two of the other ones started sticking Stump with an ice-pick-type knife. They both jumped him, but I could tell for sure that one guy was stabbing him, and I'm not

sure about the other guy. One broke off to the kitchen, and the other threw the knife out the window. The guy who threw the liquid in his face just backed off. The liquid was steaming, and I could smell bleach, so I think it was a mixture of bleach and boiling water.... *I have seen Lloyd Schlup, and I know who he is. He is definitely not one of the guys I saw jump Arthur Dade, who I knew as "Stump."* I know that one of the three men involved has never been prosecuted, and I know that Lloyd Schlup is innocent.

Affidavit of Donnell D. White, at 2, 3 (Apr. 21, 1993) (emphasis added). White describes "the third guy" as "a white guy with tatoos [sic] all over his arms." *Id.* at 2. Lieutenant Faherty indicates that Randy Jordan was "covered" with tattoos. Affidavit of Robert Faherty, at ¶ 7 (Oct. 26, 1993). White's testimony is otherwise consistent with that of the prosecution: Rodnie Stewart was convicted for his role in Dade's murder, which consisted at least in part of throwing a cup of liquid in Dade's face. *See State v. Stewart,* 714 S.W.2d 724, 725–26 (Mo.Ct.App.1986).

Joseph Beck also attests to Schlup's innocence: "I witnessed the knifing of Arthur 'Stump' Dade. It happened immediately in front of my cell, 3–3½ feet away. Lloyd Schlup was not in sight, not even on the flag, where stabbing took place. Never saw Schlup." Affidavit of Joseph N. Beck (Feb. 5, 1992).

James Pierce was waiting for his friend Wardell Harvey to accompany him to lunch when he witnessed Dade's murder: "I saw two white guys go onto 1–walk. One of them threw a cup of liquid in Arthur Dade's face, and the other one stabbed him. Lloyd Schlup was not involved in the stabbing." Affidavit of James Pierce, at 1 (Apr. 21, 1993). Dade was a black man, and his murder may have been racially motivated. Those involved were alleged to be members of a white supremacist group in the prison.

---

**2.** The state argues that Green's latest affidavit is inconsistent with his testimony in the trial of Rodnie Stewart. Green then indicated that he had not seen the stabbing itself. While this inconsistency would need to be explored on remand, I believe it is fairly easily explained. Green was at that time still in prison and justifi-

ably afraid for his well-being. *See infra* n. 11. It was probably in his interest to say that he had arrived just after the stabbing as he then indicated. Now that he has been out of prison for seven years, he no longer is afraid to let the truth be known.

Pierce is also black and adds the following: "I have no reason to lie for a white guy. . . . I know for certain that Lloyd Schlup did not kill Arthur Dade, and that he was not even present when Dade was killed." *Id.* at 2.

LaMont Griffin–Bey was also on his way to lunch when he witnessed Dade's murder: "The first thing I saw of the fight was Rodney Stewart throw liquid in Arthur Dade's face, and O'Neal stab him. . . . Lloyd Schlup was not present at the scene of the fight." Affidavit of LaMont Griffin–Bey, at 2–3 (Apr. 7, 1993). Griffin–Bey made contemporaneous statements consistent with this affidavit. He told prison investigators that he "saw one man throw some water in his face. And when he went down the other man started hitting him with a knife." Excerpt of Transcript of Inmate Interviews, Exhibit 1A in Support of Petition for Writ of Habeas Corpus (interview of LaMont Griffin–Bey).

Although he failed at that time to identify either of Dade's assailants (stating initially that he "don't know none of those dudes" and later stating an unwillingness to comment on that because "this is too serious for me"), Griffin–Bey did indicate that of the two, "Sgt. Flowers grabbed one" and the other got away. *Id.* It is uncontroverted that Sergeant Flowers detained Stewart at the scene of the murder and that O'Neal ran to the dining room. An earlier affidavit by Griffin–Bey also supports his most recent statement: "I witnessed the knifing of Arthur Dade on [February 3, 1984]. I saw two men and the

victim involved in the knifing. I did not see Lloyd Schlup around the area and I was standing approximately 10 ft. away from where the incident happened." Affidavit of LaMont Griffin–Bey (Jan. 21, 1992).

Each of these five eyewitnesses [3] was available to be interviewed by trial counsel had he simply noticed their depositions while he was at the prison to depose those on the prosecution's list, yet this was not done. The district court determined it was unnecessary to hear these witnesses in open court, apparently because there is "something suspect about affidavits produced after a long delay" and the "affiants are all fellow inmates who do not necessarily have a strong incentive to refrain from perjuring themselves." *Schlup v. Delo,* No. 4:92CV00443, slip op. at 12 (E.D.Mo. Aug. 23, 1993). Of course, not all the affiants are currently fellow prisoners, as noted above,[4] but the district court's reasoning is unpersuasive in any event, given the facts of this case. The murder for which Schlup has been convicted occurred in prison. It follows that the eyewitnesses (other than the prison guards) would be fellow prisoners. These affidavits were not presented earlier because Schlup's trial counsel (and earlier post-conviction counsel) never interviewed his fellow inmates, at least two of whose statements to prison investigators revealed their status as eyewitnesses. In addition, Lieutenant Faherty indicates in his affidavit that several of these prisoners, particularly John Green and Joseph Beck, are reliable

---

3. One additional eyewitness merits mention. According to the transcript of the inmate interviews conducted by prison investigator George Brooks, inmate Ricky McCoy asserted both that there was a "crowd of people" (indicating a generous supply of eyewitnesses to be interviewed by Schlup's trial counsel) and that "[t]here was just only two [perpetrators]. No doubt about it." He then identifies "Neal" as the man who stabbed Dade and a photo of Stewart as the man who threw the cup of water. Excerpt of Transcript of Inmate Interviews, Exhibit 2 in Support of Petition for Writ of Habeas Corpus (interview of Ricky McCoy).

The panel opinion denying Schlup's initial appeal states that although Schlup's trial counsel reviewed the statements made by Griffin–Bey and McCoy, he decided that their "testimony would be repetitive of the testimony to be presented at trial." *Schlup,* 941 F.2d at 639. Given that trial counsel presented no eyewitnesses to

the murder, it eludes me how their testimony could reasonably be considered repetitive.

The record now before us reveals that Schlup's counsel did depose McCoy and that McCoy denied having witnessed the incident. Deposition of Ricky McCoy (June 26, 1984). No one asked McCoy about his prior statement that he had witnessed the murder. Under the circumstances counsel was required to compel McCoy's testimony. *See infra* at 747.

4. John Green's affidavit was not part of the record before the trial court, nor was the transcript of his testimony in Rodnie Stewart's trial. The record has expanded repeatedly before our court at the request of both the parties and the court. Lieutenant Robert Faherty's affidavit has been added, as have the thirty-nine depositions (of thirty-eight individuals) taken from the prosecutor's files.

witnesses, unlike many prisoners. Affidavit of Robert Faherty, at ¶ 7 (Oct. 26, 1993). Essentially what the district court and implicitly this court require is that one wrongly convicted of a murder in prison present innocents as eyewitnesses and be able to afford competent counsel from the beginning. Schlup could, of course, do neither. Rather than discount these eyewitnesses' statements sight unseen, the district court should have granted Schlup the evidentiary hearing he requested, and then these witnesses could be subject to examination by the state and their credibility could be accurately determined.

The state argues that Schlup's counsel was effective and notes specifically that he deposed thirty-eight witnesses. These depositions were done collectively by Schlup's, Stewart's, and O'Neal's attorneys, in the presence of the prosecutor, over a period extending from June 26 to July 10, 1984. Of the thirty-eight witnesses, fourteen were inmates and the remaining twenty-four were either prison personnel or other law enforcement officers. Eight of the fourteen inmates refused to answer questions, and some of them relied on the Fifth Amendment.

Other inmates were discussed during the deposition of corrections officer George Brooks, who indicated that he had interviewed all of the inmates on walks one through four and that none of these inmates had any knowledge of the incident. Deposition of George Brooks, at 9 (July 2, 1984). Schlup's counsel apparently accepted this testimony as fact and failed to interview the inmates on these walks.[5] This is ample evidence of his ineffectiveness, but he was further ineffective in accepting inmates' statements that they would not testify because they had taken the Fifth Amendment.

Our court set the standard for attorney competence in investigating witnesses and compelling their testimony in *Eldridge v. Atkins,* 665 F.2d 228, 235 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982):

> When a man's liberty is at stake counsel owes a greater duty than to simply accept someone's hearsay statement that the witness would rather not testify. A lawyer's duty to defend rises to a greater measure of responsibility. A competent lawyer's duty is to utilize every voluntary effort to persuade a witness who possesses material facts and knowledge of an event to testify and then, if unsuccessful, to subpoena him to court in order to allow the judge to use his power to persuade the witness to present material evidence.

Competent counsel are required, as indicated above, to use every means necessary to persuade these witnesses to present material evidence. A witness who pleads the Fifth Amendment

> is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified, and to require him to answer if "it clearly appears to the court that he is mistaken."

*Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (citations omitted). Schlup's counsel did not give the court that opportunity. He did not interview eyewitnesses to the murder who would have testified that Schlup was not present and did not participate, and he did not compel the testimony of those who refused to testify. His performance violated Schlup's constitutionally protected right to counsel.

---

**5.** No evidence in the record supports the majority's assertion that Schlup's trial counsel "arranged" for the taking of these thirty-eight depositions. It appears that the only witnesses deposed were those proffered by the state. If it is true, as the majority suggests, that trial counsel read the statements of the one hundred inmates on walks one through four, he has even less excuse for failing to interview individually Griffin–Bey and McCoy, who both told prison investigators that they had witnessed Dade's murder.

Regardless of whether he read the statements, he was obligated to interview these potential eyewitnesses individually. His failure to do so is the essence of Schlup's claim of ineffective assistance. Lest the point be lost in the majority's recitation of what trial counsel did do, let me repeat: at no point before, during, or after trial did Schlup's counsel interview any of the one hundred potential eyewitnesses made known to him by the state. In this his representation fell below the level required by the Sixth Amendment.

## B

In addition to the eyewitness testimony discussed above, Schlup also presents this court with new evidence in support of the alibi defense he presented at trial. That defense consisted of the testimony of several prisoners that Schlup had walked ahead of them to the dining room, the testimony of Lieutenant Faherty that he had spoken to Schlup outside the dining room, and the videotape that shows Schlup as the first inmate to arrive in the dining room.

The importance of the videotape is in the time lapse between when Schlup arrived, when the guards received a call over their radios about the attack on Dade, and when O'Neal and Jordan arrived. No one disputes that Schlup was first in line for lunch on February 3, 1984. The surveillance videotape of the dining room confirms this fact. According to the videotape, one minute and five seconds elapsed from Schlup's entrance into the dining room until the guards received a radio call about the fight. Twenty-six seconds after the guards responded to the radio call O'Neal ran into the dining room dripping blood. Prison investigator George Brooks testified at trial that one could run from the scene of the crime to the dining room in just over thirty seconds, with a brisk walk taking over a minute.

At trial it was believed that the radio call to which the dining room guards can be seen responding was made several minutes after the stabbing had occurred. Captain Eberle testified that he had radioed for help when he first arrived on the scene, which was several minutes after the stabbing. This would arguably have given Schlup time, as the state asserted in its closing arguments, to get to the dining room one minute before the call went out over the radio.

Schlup presents new evidence on this point, however, evidence that apparently was available at the time of trial but was not presented to the jury due to the ineffectiveness of Schlup's trial counsel. John Green, the eyewitness whose testimony is discussed above, did more than simply watch the stabbing on February 3. Sergeant Flowers called out for someone to call the base, and Green did just that. He told the prison investigators about this phone call when he was first interviewed: "I heard Sgt. Flowers calling for officers cause they had had a fight. Couldn't get nobody so he told me to call base to notify them of the fight and that's what I did." Excerpt of Transcript of Inmate Interviews, Exhibit 4A in Support of Petition for Writ of Habeas Corpus (interview of John Green). This phone call took place just after he saw "inmate Dade fall right there in front of the office." *Id.*

Green's affidavit provides greater detail: "When I called base, it was within seconds of Dade hitting the ground. It could not have been more than a half minute or a minute after he was stabbed by Jordan and O'Neal. It happened very fast." Affidavit of John L. Green, at 4 (Sept. 7, 1993).[6]

Lieutenant Faherty has also expanded on his earlier trial and deposition testimony. He testifies that he was on duty at T-3, a door about halfway between Schlup's cell and the dining room that is kept locked except when inmates are moving from one place to another. When T-3 was opened from base control at his direction, he saw Schlup "coming down the corridor.... He was walking a leisurely pace with his hands in his pockets." Affidavit of Robert Faherty, at ¶ 4 (Oct. 26, 1993). Schlup stopped at a window to yell at someone outside, Faherty reprimanded him, and Schlup walked to T-3. Faherty "patted him down, and he went to the dining room. [Schlup] was not perspiring or breathing hard, and he was not nervous." *Id.* Faherty was relieved from T-3

---

**6.** *Sergeant Peoples, who was the dispatcher at* base control at the time of the stabbing, indicated that he had been called by Captain Eberle. Deposition of Ellis R. Peoples, at 9–10 (July 5, 1984). He was not asked about John Green or whether any inmate had called in the fight. He did testify that he kept a log of this incident, and Lieutenant Faherty likewise testified in his deposition of the existence of certain logs. None of these appear in the record, and there is no evidence that they were ever examined by Schlup's trial counsel. One of the difficulties in this case is ascertaining absolute times (it all occurred "about noon"), and these logs would seem to be useful in this regard. The absence of these logs is but further evidence of the ineffectiveness of Schlup's trial counsel.

shortly after Schlup passed through, and Faherty then went to the dining room. He estimates that Schlup was in his presence (presumably from the corridor the other side of T–3 and into the dining room) for two-and-a-half to three minutes. It would take Schlup another thirty seconds to walk from his cell to where he first entered Faherty's line of sight. *Id.* at ¶ 6. Counting the minute in the dining room prior to the radio call (when he was presumably in Faherty's presence as well), Schlup left his walk at least three to three-and-a-half minutes before the radio call.[7] If the radio call came in response to John Green's phone call, it is impossible, as Faherty asserts, for Schlup to have participated in Dade's murder.

Given the timing of this call for help and the evidence presented at trial (the videotape, the testimony of Lieutenant Faherty, and the testimony of Brooks on how long it takes to move from the scene of the crime to the dining room), it is not possible that Schlup could have participated in Dade's murder and been in the dining room as the videotape indicates. In short, Lloyd Schlup could not have been in two places at the same time. O'Neal arrived nearly thirty seconds after the radio call, and the prosecution's testimony establishes that he took off at a run. He was followed into the dining room by Randy Jordan. Rodnie Stewart had already been detained. Meanwhile, as Schlup has maintained since the beginning, he was simply in the dining room eating his fish sandwich.

## II

Despite the weight of this new evidence, the court refuses to reach the merits of Schlup's claim that his counsel was ineffective by declaring the issue subject to procedural bar. The procedural hurdles habeas petitioners must clear stem from two sorts of concerns. First, we wish to insure that state courts are given an opportunity to review such claims before we will review them ourselves, and second, we fear that late-blooming claims of error that could have been raised earlier are little more than dilatory tactics by petitioner's counsel. Neither concern is implicated in this case because Schlup has asserted since the beginning that his trial counsel was ineffective for failing to interview eyewitnesses to Dade's murder.

### A

Schlup was convicted on December 11, 1985, after a two-day trial.[8] His conviction was affirmed on February 17, 1987, by the Missouri Supreme Court and the United States Supreme Court denied certiorari on June 8 of that year. *See State v. Schlup,* 724 S.W.2d 236 (Mo.), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3198, 96 L.Ed.2d 685 (1987). Less than six weeks later Schlup filed for postconviction relief in the Missouri courts under Rule 27.26 as it then existed. This was the first opportunity that Schlup had to raise the ineffectiveness of his trial counsel because no record had been made which would allow the issue to be raised on direct appeal. Schlup raised the issue loudly and clearly, alleging that his trial counsel was constitutionally ineffective in that he "failed to interview witnesses in support of [his] defense including Robert O'Neal, Van Robinson, Lamont Griffin and Ricky McCoy, who were witnesses to the crime of which Petitioner was convicted, and who would have testified that Petitioner was not one of the three inmates involved."

---

7. Faherty indicates in his affidavit that it must have been five to five-and-a-half minutes from the time Schlup left his cell to the time of the radio call. This is somewhat inconsistent with the details of both his affidavit and his earlier trial testimony and deposition. Any inconsistency should be explored, and perhaps explained, at an evidentiary hearing. One need only rely on the most conservative estimate of a three-minute lapse to conclude that Schlup could not have participated in Dade's murder.

8. The state asserted at oral argument that we should not "retry" this case on habeas and asked

what we would tell the jury that sat through this two-week or three-week long trial, implying that we would somehow be showing disrespect to the jury if we found that Schlup deserved a new trial because of trial counsel's failure to present that very jury with exculpatory witnesses. I repeat that Schlup received only a two-day trial. Had trial counsel presented the exculpatory eyewitnesses now presented, the jury would have received the full picture of Dade's murder, and if it were to credit the new evidence, it would have no choice but to acquit.

Rule 27.26 Motion at 2, *Schlup v. State,* No. CV187–3457CC (Circuit Court of St. Charles County, Mo., filed July 18, 1987). Schlup also alleged that his "counsel failed to investigate Petitioner's alibi defense and failed to interview Randy Jordan, who Petitioner believes was in fact the third participant in the murder of which Petitioner was convicted." *Id.* at 3.

An evidentiary hearing was held at which Schlup's trial counsel testified, and the motion court ruled against Schlup, finding that his trial counsel had been effective. *See Schlup v. State,* No. CV187–3457CC (Circuit Court of St. Charles County, Mo., Nov. 6, 1987). The court accepted trial counsel's testimony, and found that the witnesses who were not interviewed were either not made known to trial counsel by Schlup or "were known not to have information which would assist the defense." *Id.* at 4.

Schlup appealed this adverse decision, specifically alleging that trial counsel was ineffective for not interviewing the aforementioned witnesses. Appellant's Brief at 4, *Schlup v. State,* 758 S.W.2d 715 (Mo.1988) (No. 70694). The Supreme Court of Missouri ignored this issue when it affirmed the motion court's decision. *See Schlup v. State,* 758 S.W.2d 715 (Mo.1988) (en banc).

Schlup then raised the issue in his pro se petition for federal habeas filed in the Eastern District of Missouri. His handwritten petition alleges that trial counsel "[d]id not interview inmate John Green; who was the inmate 'clerk' and gave statement to investigators that he put out the phone call to base control." His amended petition prepared by counsel restated the language of the 27.26 motion, alleging that "Petitioner's trial counsel ... failed to interview witnesses in support of [the] defense including Robert O'Neal, Van Robinson, Lamont Griffin and Ricky McCoy, who were witnesses to the crime of which petitioner was convicted, and who would have testified that Petitioner was not one of the three inmates involved." First Amended Petition, Attachment to 11(a)(3) at 1 (¶ A(1)), *Schlup v. Armontrout,* No. 89–0020C(3) (E.D.Mo. filed March 7, 1989). Schlup also alleged ineffectiveness of trial counsel for failure to call "those persons who would have testified that Petitioner was not the third inmate involved in the murder of which he was convicted" including the aforementioned. *Id.* at 2 (¶ A(5)). Counsel raised this issue in the briefs filed with the district court as well. *See* Petitioner's Brief at 9–10, *Schlup v. Armontrout,* No. 89–0020C(3) (E.D.Mo. May 31, 1989).

The district court ruled summarily and without any basis that the claims raised in paragraphs A(1) and A(5), along with others, were "barred from further consideration" because of Schlup's "failure to assert them at trial, to include them in his motion for new trial, to brief them on appeal, or to pursue them in [his] post-conviction proceedings." *Schlup v. Armontrout,* No. 89–0020C(3), slip op. at 6 (E.D.Mo. May 31, 1989), *aff'd,* 945 F.2d 1062 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1273, 117 L.Ed.2d 499 (1992).

Schlup appealed to our court, again arguing that trial counsel had been ineffective for "fail[ing] to investigate and call witnesses, including alibi witnesses, in petitioner's case in chief." Appellant's Brief at 18, *Schlup v. Armontrout,* 945 F.2d 1062 (8th Cir.1991) (No. 90–1164EM). Rather than remand the matter to the district court so that it could make the initial determination on the merits (and perhaps conduct the evidentiary hearing that Schlup has never had in federal court), we addressed the merits of his claims and found them wanting.

Had we fully explored the alleged procedural default, we would have found it to be nonexistent. Schlup raised the issue to the Circuit Court of St. Charles County, Missouri, and to the Supreme Court of Missouri, but because the Missouri Supreme Court failed to address the issue the district court ruled that Schlup had failed to raise it in that forum. The Missouri Supreme Court's error was attributed to Schlup, and our ruling only compounded the injustice.

## B

We erred in not remanding the case to the district court two years ago. Had we done so, his present counsel, who was appointed immediately following our prior ruling and

who is the only truly competent counsel to have represented Schlup since the beginning, would have had an opportunity to develop the record we now have before us and this claim could have been addressed on the merits by the district court as it should have been in the first place.

The only procedural hurdle that remains in Schlup's path is our affirmance of the district court's error in failing to address this claim when it was first presented. There are two routes around this procedural bar. The route pursued in the briefs is the actual innocence or fundamental miscarriage of justice exception to bar, but that exception normally is pursued when the failure to raise the claim earlier can be traced to the petitioner. In this case the fault lies with the federal courts, and the second route around this bar can be remedied most sensibly by this federal court. Justice requires that we correct our prior decision, which we can do by recalling the mandate and remanding the initial petition to the district court for an evidentiary hearing on the merits of the ineffective assistance claim. Recall of the mandate is authorized "to prevent injustice," 8th Cir.R. 41A, and we have done so in the death penalty context in the past. *See Simmons v. Lockhart,* 856 F.2d 1144 (8th Cir.1988). Schlup has asserted that trial counsel was ineffective for failing to interview eyewitnesses since the beginning, and it is time that his evidence to support that claim be heard in open court.

## III

If we do not recall our prior mandate, Schlup's claims are barred as either successive, abusive, or procedurally defaulted, *see Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992), but exceptions must be made if a petitioner adequately asserts either cause and prejudice or a fundamental miscarriage of justice, which is also known as the "actual innocence" exception. *See id.,* at ——, 112 S.Ct. at 2518–19. If the evidence Schlup has presented were to stand up in an evidentiary hearing, it would satisfy the actual innocence standard, and we should therefore address the merits of his claim that his counsel was constitution-

ally ineffective during the guilt phase of his trial. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A

Under the Supreme Court's decisions on actual innocence, the standard to be applied in this case is stated in *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), in which Justice Powell stated the requirement that

> the prisoner must "show a fair probability that, in light of all the evidence, ... the trier of fact would have entertained a reasonable doubt of his guilt." Thus, the question whether the prisoner can make the requisite showing must be determined by reference to *all* probative evidence of guilt or innocence.

*Id.,* at 454 n. 17, 106 S.Ct. at 2627 n. 17 (Powell, J., for a plurality) (quoting Henry Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U.Chi. L.Rev. 142, 160 (1970) (footnote omitted)) (emphasis in original). I believe that Schlup has met this standard, but, as the majority correctly notes, our court has applied a different standard, essentially reading the Supreme Court's decision in *Sawyer* as implicitly overruling *Kuhlmann* in this regard.

In *Sawyer,* the Supreme Court affirmed the Fifth Circuit, quoting with approval the test adopted by that court:

> "[W]e must require the petitioner to show, based on the evidence proffered plus all record evidence, a fair probability that a rational trier of fact would have entertained a reasonable doubt as to the existence of those facts which are prerequisites under state or federal law for the imposition of the death penalty."

*Sawyer,* —— U.S. at ——, 112 S.Ct. at 2523 (quoting *Sawyer v. Whitley,* 945 F.2d 812, 820 (5th Cir.1991)). The Court then restated the test, changing it markedly in the process, in what has become an all too common sleight-of-hand. Despite its praise for the Fifth Circuit standard (which comes, of course, from *Kuhlmann*), the Court now requires that one arguing innocence *of the*

*death penalty* provide "clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty." *Id.* I also believe that Schlup has satisfied this test, which our court has *sua sponte,* and in my view erroneously, extended to apply to convictions as well as to sentences. See Appellants' Briefs in *Cornell v. Nix,* 976 F.2d 376 (8th Cir.1992) (en banc) and *McCoy v. Lockhart,* 969 F.2d 649 (8th Cir.1992), neither of which argue for the extension of *Sawyer.* The Fifth Circuit, which was affirmed by the Supreme Court in *Sawyer,* has not extended that ruling to convictions, ruling instead that the *Kuhlmann* standard continues to apply to convictions. *See Montoya v. Collins,* 988 F.2d 11, 13 (5th Cir.) (restricting *Sawyer* to the sentencing phase and continuing to apply *Kuhlmann* to the guilt phase), *cert. denied,* — U.S. —, 113 S.Ct. 1630, — L.Ed.2d — (1993).

As a panel, we are of course bound by *Cornell,* but if ever there were a case in which the Supreme Court might wish to clarify the law on this issue, this is the one. Schlup has presented a strong case of actual innocence. I believe it meets the *Cornell* standard, and I believe it is "truly persuasive" as required by *Herrera v. Collins,* — U.S. —, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993), but the majority does not. What either the majority or the district court, which noted that Schlup presented a stronger case of actual innocence than did Herrera (and the evidence has only increased since the district court's decision), would do if Schlup were simply required to show a "fair probability" of his innocence is not known, but only our court en banc or the Supreme Court can make that happen.

### B

Once Schlup clears the procedural hurdles put in place by this court and the Supreme Court, the merits of his claim of ineffective assistance of counsel must be addressed. Schlup alleges that trial counsel's failure to conduct a reasonable investigation of the circumstances surrounding the murder deprived him of his rights under the Sixth Amendment. *See Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Petitioners alleging ineffective assistance of counsel must show both that counsel's performance failed to meet "the standard of reasonableness under prevailing professional norms" and that "but for counsel's ineffective assistance there is a reasonable probability that the result of the trial would have been different." *Grooms v. Solem,* 923 F.2d 88, 90 (8th Cir.1991). The test for prejudice is substantially easier to satisfy than is the test for actual innocence (which I have already indicated Schlup's evidence satisfies), so the only remaining question is whether the newly presented evidence could, and should, have been discovered by competent trial counsel.

Despite having access to transcripts of prisoner interviews, some of which contained statements of eyewitnesses, Schlup's counsel failed to conduct any reasonable investigation.[9] This court has held repeatedly that failure to interview potential alibi witnesses constitutes a lack of competence under *Strickland. See, e.g., Grooms,* 923 F.2d at 91; *Lawrence v. Armontrout,* 900 F.2d 127, 129–30 (8th Cir.1990). Failure to interview potential *eye* witnesses is unquestionably a more egregious failing than failure to interview alibi witnesses. In this case, Schlup offers both eyewitnesses and, at least indirectly, an alibi witness, all of whom would have been uncovered by a reasonable investigation of the circumstances surrounding Dade's murder.

John Green's statement that he had called the base, a statement that certainly would have bolstered Schlup's alibi, was available to trial counsel in the transcript of prisoner interviews conducted by Brooks.[10] Had

---

9. Schlup's trial counsel apparently failed even to inquire of Stewart's and O'Neal's counsel about potential eyewitnesses. Both of these trials took place before Schlup's and both defense counsel presented eyewitnesses to Dade's murder. Some of those witnesses might not have helped directly, but counsel would have at least become aware that the crime occurred in a crowded cellblock and that the possibility of eyewitnesses should be investigated.

10. I assume that transcripts of the prisoner interviews were available to trial counsel. Were they unavailable, Schlup is entitled to relief under

counsel then interviewed Green, he could have asked the question that none of the transcripts of prisoner interviews reveals to have been asked of any prisoner: Was Lloyd Schlup present at Dade's murder?[11] Counsel would have had further incentive to interview McCoy[12] and Griffin–Bey, who both admitted to prison investigators that they witnessed the crime. They too could have been asked whether Schlup was present.

Even if counsel were not made aware either by Schlup or by prison authorities that there were witnesses to the murder, he was obligated simply by common sense to investigate the possibility. This murder occurred as prisoners were being released from their cells to go to lunch. The existence of witnesses to the murder was as inevitable as their reluctance to cooperate either with prison investigators or with a room full of lawyers and O'Neal.[13] Counsel's failure to investigate these witnesses and the other eyewitnesses was unreasonable under our case law, and Schlup is therefore entitled to relief if these witnesses' testimony were to survive the rigors of an evidentiary hearing.

## IV

Under *Delo v. Blair*, —— U.S. ——, 113 S.Ct. 2922, 125 L.Ed.2d 751 (1993) (per cu-

riam), all that is required for a stay to issue on a second or subsequent habeas petition is that the petitioner present " 'substantial grounds upon which relief might be granted.' " *Id.* at ——, 113 S.Ct. at 2923 (quoting *Herrera v. Collins*, —— U.S. at ——, 113 S.Ct. 853, 873, 122 L.Ed.2d 203 (1993) (O'Connor, J., concurring)). In *Blair*, the Court objected to the issuance of a stay because the district court had stated that the facts in that case mirrored those that the Court had recently rejected in *Herrera*. This case is distinguishable on a number of grounds.

First, Schlup is not relying exclusively on a constitutional claim of actual innocence, but is using innocence as a gateway to reach the merits of his ineffective assistance claim. Second, the district court indicated that Schlup has presented a stronger case than did Herrera in that Schlup's affidavits do not consist of hearsay but of eyewitness testimony, and Herrera was, in the opinion of the district court, "convicted on the basis of a larger quantity of evidence than was presented at [Schlup]'s trial." *Schlup v. Delo*, No. 4:92CV00443, slip op. at 11 (E.D.Mo. Aug. 23, 1993).[14] Third, those affidavits presented by

---

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967), due to the prosecution's failure to turn over such exculpatory evidence in violation of due process.

11. George Brooks indicated in his deposition that he only asked the inmates if they had witnessed Dade's murder or anything else unusual on that date. In short, the inmates were being asked by prison guards to "snitch" on fellow inmates when the eyewitnesses were all too aware that the guards were in no position to provide protection from the perpetrators and their cronies. This murder took place in the Special Management Unit, also known as "SuperMax," yet even prison personnel were fearful of appearing in this area alone. *See* Deposition of William Rutledge, Associate Warden, at 16, 19 (June 29, 1984). The latest inmate affidavits indicate that they too were afraid to travel alone even to lunch, as evidenced by several of them waiting for friends before walking to the dining room.

12. Counsel did depose McCoy but the record indicates no effort to interview him outside of the presence of the prosecutor or O'Neal. One purpose of such an interview might have been to reconcile his deposition with his earlier state-

ment to prison investigators. *See supra* n. 3. Schlup's counsel informs us that McCoy is now dead, so I presume no further explanation will be forthcoming.

13. Several of the depositions of inmates who refused to answer questions reflect the prosecutor's belief that O'Neal was responsible for the inmates' reticence. It seems quite likely that an interview in O'Neal's presence would not be the most conducive environment in which to gain the cooperation of eyewitnesses, yet the record reveals that Schlup's counsel made no effort to contact eyewitnesses (as opposed to alibi witnesses) individually.

14. The only significant evidence presented by the state at Schlup's trial was the testimony of two prison guards who gave conflicting statements as to the details but who both testified that Schlup was the third participant with O'Neal and Stewart. Unlike O'Neal, whose clothing was covered with Dade's blood, no physical evidence linked Schlup to this crime. Neither guard has ever been asked about Randy Jordan, whom Schlup asserts was the prison "snitch." In addition, Schlup's counsel informed us during oral argument that one of the two prison guards has, and

Schlup that identify the actual perpetrator point to Randy Jordan, whose whereabouts are presently unknown but, unlike in *Herrera* and *Blair*, who is not known to be deceased. And fourth, Schlup has maintained his innocence since the beginning, while both Blair and Herrera had, knowingly and voluntarily or not, confessed. Schlup presents a much stronger case of actual innocence than did either Blair or Herrera. The present petition presents substantial grounds upon which relief might be granted, and we should therefore stay Schlup's execution and remand this case to the district court for an evidentiary hearing.

## V

The legal rulings by this court and by the district court place Lloyd Schlup in an inextricable bind. Why, the court asks, did you not present this evidence sooner? Because my earlier counsel failed to conduct a reasonable investigation, Schlup responds. Why then do you not present us with pillars of the community to prove your innocence? Because the crime occurred in prison, he replies, and few pillars of the community occupy prison cells. That, says the court, is unfortunate, for absent virtuous eyewitnesses or a time machine, there is nothing we can do. Just as the Ninth Circuit told Henry Deutscher in regard to his death sentence,[15] this court tells Lloyd Schlup in regard to his conviction: You may indeed be innocent, but you are not innocent enough early enough.

Justice requires that we remand this matter to the United States District Court for an evidentiary hearing.

Before RICHARD S. ARNOLD, Chief Judge, McMILLIAN, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

---

had at the time of Schlup's trial, a criminal record that includes three felonies. Under Missouri law, these felonies, though not of recent origin, could have been introduced to impeach Maylee if trial counsel had only conducted sufficient investigation to uncover their existence. The record reveals no evidence that such an inquiry took place, and the jury was consequently deprived of this evidence as well.

## ORDER

November 17, 1993.

The suggestion for rehearing en banc and the motion for stay of execution are denied. Chief Judge Arnold, Judge McMillian, and Judge Wollman would grant the suggestion and the motion.

RICHARD S. ARNOLD, Chief Judge, dissenting, joined by McMILLIAN and WOLLMAN, Circuit Judges.

I would grant the suggestion for rehearing en banc to consider two questions raised by the petitioner Lloyd Schlup.

1. Schlup argues that he is actually innocent of the crime of capital murder in the sense necessary to enable this Court to avoid the state's procedural defenses and reach the merits of his contention that his trial counsel was ineffective. In assessing this claim, our panel applied the rule of *McCoy v. Lockhart,* 969 F.2d 649 (8th Cir.1992). In *McCoy,* we held that a miscarriage of justice for purposes of avoiding procedural defenses can be found only when petitioner has shown by clear and convincing evidence that but for the constitutional error, no reasonable juror could find him guilty. 969 F.2d at 651. The *McCoy* Court lifted this standard from *Sawyer v. Whitley,* —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), a case having to do only with the question of punishment, not that of guilt or innocence.

As our panel in the present case acknowledged, there is some warrant for Schlup's argument that *Sawyer* was intended by the Supreme Court to apply only to questions of punishment, and that the *Sawyer* opinion itself preserves unchanged, for purposes of the guilt-phase, the earlier standard of *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct.

---

**15.** *See Deutscher v. Whitley,* 991 F.2d 605, 606 (9th Cir.1993) (holding that although Deutscher had "shown to [the court's] satisfaction that it is more probable than not that, but for his constitutionally deficient counsel, he would not have been sentenced to die," he nonetheless did not satisfy the new standard set by the Supreme Court in *Sawyer,* and consequently did not merit relief).

2616, 91 L.Ed.2d 364 (1986) (requiring a petitioner to show a fair probability that, in light of all the evidence, the jury would have entertained a reasonable doubt of his guilt). See *Sawyer*, —— U.S. at —— n. 5, 112 S.Ct. at 2519 n. 5.

Our panel did what it had to do. It was bound to follow *McCoy* and it did not, as a panel, err in doing so. It seems to me, though, that there is a substantial question whether *McCoy* correctly interpreted *Sawyer*. This is a question of great importance in habeas corpus jurisprudence, and I believe it qualifies as deserving of this Court's en banc time.

2. Petitioner raises another "innocence" issue—this one an independent ground for habeas relief, rather than just a gateway through which procedural defenses can be avoided. As I understand the various opinions in *Herrera v. Collins*, —— U.S. ——, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), a majority of the Court appears to believe that, in a sufficiently strong case, innocence would be a ground for habeas relief. The case would have to be "truly persuasive" and "extraordinary." We know that these standards were not met in *Herrera* itself or in *Delo v. Blair*, —— U.S. ——, 113 S.Ct. 2922, 125 L.Ed.2d 751 (1993) (per curiam). In *Blair*, a stay of execution was dissolved on the ground that the evidence of innocence was no more persuasive than that presented in *Herrera*.

In my view, it is likely that Schlup's evidence of innocence is substantially more persuasive than Herrera's or Blair's. I am not nearly so familiar with the record as the members of the panel, but Judge Heaney's dissent convinces me that there is at least a substantial likelihood that a trier of fact would consider Schlup's evidence sufficiently persuasive to meet the high *Herrera* standard if an evidentiary hearing were held. To be sure, there are contradictions in both sides' evidence, and I agree with the panel that, even after all of the new evidence is considered, a reasonable jury could still find Schlup guilty. In this sense, the *Herrera* standard seems easier to meet than the *Sawyer* standard, which is quite close to that of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In other words,

under *Herrera*, if evidence is newly discovered, a habeas petitioner could obtain relief by making a "truly persuasive" or "extraordinary" case, even if, after considering the new evidence, a reasonable jury could still convict him.

This, at any rate, seems to me the present state of the law. If I am right, Schlup may have a substantial ground for relief. Whether he does or not is admittedly a fact-intensive question, not the sort of thing of which en banc proceedings are normally made. But where human life is at stake, I believe rehearing en banc is appropriate whenever a petitioner makes a substantial claim, even if it is fact-specific.

For these reasons, I would grant the suggestion for rehearing en banc, and I respectfully dissent from the order denying it.