### Jack E. ALDERMAN, Petitioner–Appellant,

v.

### Walter D. ZANT, Respondent–Appellee.

No. 92–8705.

United States Court of Appeals, Eleventh Circuit.

April 14, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 12, 1994.

**1544**

G. Terry Jackson, Jackson and Schiavone, Savannah, GA, for appellant.

Mary Beth Westmoreland, Sr. Asst. Atty. Gen., Atlanta, GA, for appellee.

Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and FAY, Senior Circuit Judge.

FAY, Senior Circuit Judge:

On June 23, 1992, the United States District Court for the Southern District of Georgia denied Alderman's petition for habeas corpus relief. On October 23, 1992, the district court granted Alderman a certificate of probable cause and thus this appeal. Because we find Petitioner's multiple allegations to be procedurally barred, an abuse of the writ, or in the alternative without merit, we AFFIRM the ruling of the district court.

## FACTS

The Petitioner, Jack E. Alderman ("Alderman"), and his wife, Barbara Alderman ("Mrs. Alderman"), lived in an apartment in Chatham County Georgia. Alderman was employed as an assistant manager at the local Piggly Wiggly supermarket. Mrs. Alderman was employed in the Tax Assessor's office for the City of Savannah. In conjunction with her employment, Mrs. Alderman maintained a $10,000.00 life insurance policy that paid double benefits in the event of accidental death. Mrs. Alderman also had another life insurance policy in the amount of $25,000.00 which named her mother as beneficiary.

Alderman met John Arthur Brown ("Brown"), later convicted as an accessory to Mrs. Alderman's murder, when both Alderman and Brown were employed in the vehicle maintenance department for the City of Savannah. Brown testified that on September 19, 1974, Alderman phoned Brown and asked him to meet him at the Piggly Wiggly supermarket. Brown stated that during this meeting Alderman asked Brown to kill Mrs. Alderman in exchange for half the insurance proceeds. Brown, although claiming not to take Alderman seriously, accepted the proposition.

On Saturday, September 21, 1974, Alderman asked Brown to come to his apartment. When Brown arrived, Alderman handed Brown a twelve-inch crescent wrench and instructed Brown to go into the bedroom and kill Mrs. Alderman. Testimony indicates that Brown was initially reluctant, but agreed to strike Mrs. Alderman when persuaded by the gun wielding Alderman. Brown entered the dining room and struck Mrs. Alderman in the head with the wrench. Mrs. Alderman cried out and ran into the living room where she confronted her husband. Alderman tackled Mrs. Alderman, then assisted by Brown, placed his hands over Mrs. Alderman's nose and mouth until she was unconscious.

Alderman and Brown carried Mrs. Alderman's limp body to the bathroom and placed it in the bathtub. Alderman started to fill the tub while Brown cleaned the blood stains from both the living and dining rooms. Alderman and Brown changed clothes and left the apartment for several hours. The two men went to the Piggly Wiggly supermarket where Alderman borrowed $100.00. Alderman and Brown then went to two local Savannah bars. At some time during the evening Alderman gave Brown the $100.00.

Alderman and Brown returned to the apartment around 10:00 p.m., removed Mrs. Alderman's body from the bathtub and wrapped it in a green quilt. The two men carried the body to Alderman's 1974 Pontiac and placed it in the trunk. Brown drove Alderman's car as Alderman followed on his motorcycle. Alongside a creek in Rincon, Georgia, Brown and Alderman removed the

body from the trunk and placed it in the driver's seat. At Alderman's direction, Brown reached in the driver's window and released the emergency brake allowing the car to roll into the creek. The car stopped halfway into the creek. Again at Alderman's direction, Brown opened the car door, pulled Mrs. Alderman's body halfway out and allowed her face to fall into the creek. The two men removed the green quilt and the rubber trunk mat from the car and fled the scene on Alderman's motorcycle.

Later that evening, on September 21, 1974, Randy Hodges ("Hodges") and Terry Callahan ("Callahan") were driving home on Baker Hill Road and Highway 131. As they turned onto Highway 131 and approached Dasher's Creek, they noticed a car in the creek. Hodges jumped out, saw that there was a woman in the car and sent Callahan to Lamar Rahn's house to call for help. Effingham County Sheriff Lloyd Fulcher ("Fulcher") responded to the call. Upon his arrival at the scene, Fulcher found the victim's car in the water adjacent to the bridge. Fulcher noticed no apparent physical damage to the car. He ordered Mrs. Alderman's body to be removed from the car and taken to the hospital. Fulcher observed that there were no skid marks from the car but that motorcycle tracks were apparent in the area. Fulcher also noticed blood stains on the seat of the car and that the trunk mat was missing.

At the direction of Fulcher, Garden City police officer J.D. Crosby ("Crosby") went to Alderman's apartment only to find it locked. Crosby later returned to the apartment at approximately 2:30 a.m. and found Alderman there with a woman. Crosby informed Alderman that his wife had been involved in a traffic accident, and asked him to accompany Effingham County authorities to the hospital. Georgia Bureau of Investigation Agent H.H. Keadle ("Keadle") was present at the Effingham County hospital. Keadle and Fulcher noticed red/brown stains in the seat and crotch of Alderman's pants and on his belt. At that time, Alderman's clothes were taken from him.

Keadle's investigation confirmed Crosby's findings at the accident scene. Keadle also recovered a stained portion of a green rug and Alderman's motorcycle helmet, which had been removed from the Alderman's apartment by Mrs. Alderman's mother. Alderman's father, Jack Alderman, Sr., also gave the police the twelve inch crescent wrench that he had removed from Alderman's apartment.

Forensic Serologist Elizabeth Quarles, of the Georgia State Crime Laboratory, examined the blood found on Alderman's clothes. The blood type was consistent with Mrs. Alderman's blood. An examination of the vehicle revealed one palm print and four fingerprints which were stipulated as Alderman's. Brown's fingerprints, however, were not found on the car.

Dr. Charles Sullinger ("Dr. Sullinger") performed the autopsy upon Mrs. Alderman's body. Dr. Sullinger concluded that the laceration on the back of Mrs. Alderman's head was inflicted by a blunt instrument. Dr. Sullinger also concluded that because there existed only a small amount of blood in the car, the blow to Mrs. Alderman's head did not occur as a result of the accident. Dr. Sullinger found no evidence of any abnormalities in the heart, no scratches on the forearms and no evidence of strangulation. Dr. Sullinger concluded that the liquid in Mrs. Alderman's lungs revealed that Mrs. Alderman died as a result of asphyxia due to drowning.

Keadle's investigation led him to Brown. Brown eventually gave a statement incriminating himself and Alderman. At trial, Alderman testified on his own behalf and denied that he killed his wife.[1] Alderman testified that on the night of September 21, 1974, he and his wife had an argument and that he left the apartment alone. He allegedly took a bus to Savannah where he spent some time at two local bars. Alderman testified that he returned home at approximately 10:00 p.m. but his wife was not at home. Alderman decided to go to Rincon, Georgia to see if

1. A more complete version of Alderman's defense may be found in *Alderman v. State*, 241 Ga. 496, 246 S.E.2d 642, 644–45, *cert. denied*, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1036, 59 L.Ed.2d 84 (1979).

Mrs. Alderman was at her grandparent's home.

Alderman testified that on his way to Rincon, he observed his car on the side of the bridge at Dasher's Creek. Alderman stopped his motorcycle and went to the car where he discovered his wife's body. Alderman stated that he picked up Mrs. Alderman's head and placed it in his lap. Upon hearing a noise, Alderman fled the scene in shock and fear. Alderman allegedly forgot about his wife's body, drove to Savannah and returned to a local bar. Alderman then went to Johnny Ganem's for breakfast with friends. While at breakfast, Alderman offered Gerlina Carmack (the female present in the Alderman's apartment when Officer J.D. Crosby arrived) a ride home. Alderman had allegedly stopped at his apartment to pick up a jacket when the police arrived and took him to the hospital where he identified his wife's body.

Alderman testified that he did not know why he had left his wife's body in the creek; that he recalled nothing of his trip back to Savannah; and, the fact that his wife was dead had completely left his mind. Appellant testified that he first realized the full facts surrounding his wife's death after being treated by a psychiatrist who was able to refresh his memory as to the events surrounding her death. He further testified that after being treated by the psychiatrist he realized that fear had caused him to leave his wife's body in the creek because he knew her family would blame him for her death.

## PROCEDURAL HISTORY

Alderman was originally convicted in the Superior Court of Chatham County for the murder of his wife, Barbara Alderman. The jury determined guilt accompanied by two statutory aggravating circumstances: (1) Ga. Code Ann. § 27–2534.1(b)(4), i.e., murder "committed ... for the purpose of receiving money or any other thing of monetary value"; and (2) Ga.Code Ann. § 27–2534.1(b)(7), i.e., murder which was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." The jury sentenced Alderman to death. On direct ap-

peal, the Supreme Court of Georgia affirmed his conviction and sentence. *Alderman v. State,* 241 Ga. 496, 246 S.E.2d 642, *cert. denied,* 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 666 (1978), *reh'g. denied,* 439 U.S. 1122, 99 S.Ct. 1036, 59 L.Ed.2d 84 (1979).

Alderman sought state habeas corpus relief in an action filed in the Superior Court of Chatham County, Georgia. *Alderman v. Griffin,* Civil Action No. 14385–C. On June 4, 1979, the state habeas corpus court held a hearing without restricting counsel in the presentation of evidence or argument. Relief was denied. The Supreme Court of Georgia subsequently denied Alderman a certificate of probable cause to appeal. The Supreme Court of the United States denied Alderman's petition for a writ of certiorari. *Alderman v. Balkcom,* 444 U.S. 1103, 100 S.Ct. 1068, 62 L.Ed.2d 788, *reh'g denied,* 445 U.S. 973, 100 S.Ct. 1670, 64 L.Ed.2d 252 (1980).

Alderman then filed an application for federal habeas corpus relief in federal district court. The district court ruled on two issues and granted relief as to the conviction and sentence. *Alderman v. Austin,* 498 F.Supp. 1134 (S.D.Ga.1980). On appeal, the Fifth Circuit Court of Appeals reversed the death sentence but affirmed the conviction. *Alderman v. Austin,* 663 F.2d 558 (5th Cir. Unit B 1981); *Alderman v. Austin,* 695 F.2d 124 (5th Cir. Unit B 1983) (*en banc*). Alderman did not urge the district court to rule on the remaining issues, and proceeded with a new sentencing hearing in the Superior Court of Chatham County, Georgia.

A new sentencing hearing was held in the Superior Court of Chatham County in March, 1984. Alderman was again sentenced to death. The Supreme Court of Georgia affirmed the death sentence. *Alderman v. State,* 254 Ga. 206, 327 S.E.2d 168, *cert. denied,* 474 U.S. 911, 106 S.Ct. 282, 88 L.Ed.2d 245, *reh'g. denied,* 474 U.S. 1000, 106 S.Ct. 419, 88 L.Ed.2d 369 (1985). Alderman then filed a petition for state habeas corpus relief in the Superior Court of Butts County, Georgia. *Alderman v. Kemp,* Civil Action No. 86–V–524. The state habeas corpus court dismissed the petition on September

10, 1987 following a hearing on June 29, 1987. On October 28, 1987, the Supreme Court of Georgia denied the application for a certificate of probable cause to appeal. The United States Supreme Court denied the petition for a writ of certiorari. *Alderman v. Georgia,* 485 U.S. 943, 108 S.Ct. 1124, 99 L.Ed.2d 285, *reh'g denied,* 485 U.S. 1030, 108 S.Ct. 1588, 99 L.Ed.2d 903 (1988).

On June 23, 1988, Alderman filed a second federal petition for a writ of habeas corpus in the United States District Court for the Southern District of Georgia. The district court denied relief on June 6, 1989, without an evidentiary hearing. Subsequent to the entry of the judgment, both Alderman and the State ("Respondent") filed motions to alter and amend. On June 22, 1989, the district court entered an order denying Alderman's Motion to Alter and Amend but did not rule on Respondent's motion. During the pendency of Respondent's Motion to Alter and Amend, Alderman filed a notice of appeal.

On August 10, 1990, this Court dismissed the appeal for lack of jurisdiction based on Respondent's pending Motion to Alter and Amend. On remand, the district court entered an order on September 20, 1990 granting Respondent's Motion to Alter and Amend in part and denying the motion in part.[2] Alderman then filed an appeal challenging both decisions by the district court while at the same time challenging the court's jurisdiction to consider his own appeal due to the failure to rule on an issue. On December 27, 1991, this Court again dismissed the appeal for lack of jurisdiction because the district court failed to rule on Petitioner's claim regarding the unconstitutional composition of the traverse jury.[3]

On February 21, 1992, the district court ordered the parties to submit briefs and scheduled an evidentiary hearing for March 18, 1992. On May 11, 1992, the district court denied Petitioner's request for an evidentiary hearing on the traverse jury issue, and refused to consider the issue at the evidentiary hearing. Subsequent to the evidentiary hearing, the deposition of Brown taken on May 20, 1992, was made part of the record. On June 23, 1992, the district court entered an order denying the petition for habeas corpus relief. On October 23, 1992, the district court granted Alderman a certificate of probable cause to appeal.

## ISSUES ON APPEAL

In this appeal, both Appellant and Appellee briefed the issues extensively. Appellant, Alderman, framed twenty-nine issues while Appellee, Zant, poses thirty-one. Petitioner attacks multiple rulings by both the state and federal courts which have adjudicated his claims.[4] We find that the district court issued detailed, well reasoned orders address-

---

**2.** The district court specifically reaffirmed its finding that the Petitioner did not abandon or waive any of his rights by agreeing to a resentencing hearing. However, the court went on to amend its Order dated June 6, 1989 in regard to nine of the Petitioner's allegations it had previously held to be an abuse of the writ. The court stated that because the second state habeas court found that O.C.G.A. § 9–14–51 barred nine of the allegations contained in the successive petition, the court should defer to those rulings unless the Petitioner was able to show cause for his failure to raise the issues on the first state habeas petition. *Presnell v. Kemp,* 835 F.2d 1567, 1580 (11th Cir.1988), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989). Therefore, the court amended its Order of June 6, 1989, and held that the nine allegations it previously found to be an abuse of the writ were, in the alternative, procedurally barred.

**3.** In remanding Petitioner's appeal to the district court, this Court also stated:
Since we have had the advantage of briefs and oral arguments on the merits of this case, we note that upon remand the district court will have jurisdiction to hold an evidentiary hearing on Alderman's claims for violation of *Giglio v. United States,* 405 U.S. 150 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972); *Brady v. Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), and prosecutorial misconduct based on the alleged failure to disclose a deal between the state and witness John Brown.
(Order of December 27, 1991 at 4 n. 4.)

**4.** Those issues raised by the Appellant in which we summarily affirm the district court's rulings, or in the alternative find procedurally barred, an abuse of the writ, or wholly without merit, are as follow:

1. The district court erred in refusing to hold an evidentiary hearing of issues raised below, and deprived Petitioner of his right to due process under the Fifth Amendment.
2. The district court erred in denying authorization to obtain services of the Georgia Appellate Practice and Educational Resource Center, hence depriving Petitioner of right to effective

ing each of Petitioner's allegations, and AFFIRM the district court's rulings as stated in those orders. As supplement, this Court will address those issues raised by Appellant which it finds merit some discussion.

## DISCUSSION

### I. The *Brady/Giglio* Allegation

Petitioner asserts that his Sixth Amendment rights to effective assistance of counsel and confrontation and his Fifth Amendment right to due process were violated when the prosecution falsely denied and failed to disclose an alleged agreement with witness Brown in violation of *Giglio, Brady,* and *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).[5] Petitioner asserts that Brown agreed to testify in exchange for a life sentence. This Court affirms the district court's finding that the

assistance of counsel under the Sixth Amendment.

3. Petitioner was deprived of his Sixth Amendment right to effective assistance of counsel by original trial counsel's failure to (a) investigate and pursue meritorious jury composition claims; (b) secure attendance of vital defense witnesses; (c) adequately investigate the case and prepare for trial, and (d) counsel's totally ineffective closing argument at the guilt phase, all of which resulted in guilt and sentencing verdicts that otherwise would not have occurred.

4. Petitioner was deprived of his Eighth and Fourteenth Amendment right to a non-discriminatorily selected jury drawn from a fair cross-section of the community on his grand and petit jury panels.

5. The trial court's charge on malice shifted the burden of proof to Petitioner, depriving him of his right to a fundamentally fair trial and other rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

6. Petitioner was deprived of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by the sentencing trial court's excusal of conscientious jurors who may have had qualms about the death penalty.

7. Petitioner was deprived of his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights by the failure of the sentencing trial court to strike for cause certain automatic death penalty jurors.

8. Petitioner was deprived of his right to fair trial guaranteed by the due process clause of the Fifth and Fourteenth Amendments by improper arguments of the prosecutor at the guilt portion of the trial.

9. Petitioner was deprived of his right to a fair trial guaranteed by the due process clause of the Fifth and Fourteenth Amendments, and to be free from cruel and unusual punishment guaranteed by the Eighth Amendment, due to the improper closing arguments of the prosecutor at the penalty phase of the trial.

10. The trial court erred in permitting the state to comment on Petitioner's exercise of his right to remain silent and his right to counsel.

11. Petitioner was deprived of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process and to be free from cruel and unusual punishment by the sentencing court's refusal to charge the jury, as requested, on the effect of a non-unanimous verdict.

12. Petitioner was deprived of his rights to a reliable and considered determination of life or death by the sentencing court's jury charges on aggravating and mitigating circumstances, including the court's charge on presumptions and erroneous distinctions between substantive and procedural jury charges.

13. The prosecutor's use of peremptory challenges to strike non-*Witherspoon* excludable jurors denied Petitioner his rights to a jury fairly representing a cross-section of the community, and to due process and equal protection under the law.

14. Petitioner was tried by a jury "organized to convict" after being subject to death qualification.

15. The sentencing court failed to afford Petitioner adequate and reasonable voir dire.

16. Electrocution violates the Eighth Amendment prohibition against cruel and unusual punishment.

17. Petitioner was denied his right to meaningful confrontation and due process when the sentencing court admitted evidence in aggravation not admitted in Petitioner's original penalty phase trial.

18. Petitioner's right to be free from unreasonable searches and seizures was violated by the failure of the trial court to grant his motion to suppress.

19. The Georgia Supreme Court failed to provide Petitioner impartial review of his conviction.

20. Testimony that witness John Brown, Petitioner's co-defendant and the state's central witness against Petitioner, agreed to subject himself to a polygraph examination, deprived Petitioner of a fair trial.

21. The prosecution's failure to inform Petitioner of benefits or rewards to witness Timothy Deloach deprived Petitioner of his rights to confrontation, due process and to a fundamentally fair trial.

22. Introduction of a wrench like the wrench allegedly used in the killing, but not the actual wrench used, was prejudicial reversible error.

23. Proper venue was not proven.

5. For convenience this Court will refer to this allegation of governmental misconduct as the *Brady/Giglio* allegation.

claim is procedurally barred or in the alternative without merit.[6]

### A. Procedural Default

■ Pursuant to the doctrine of procedural default, a state prisoner seeking federal habeas corpus relief, who fails to raise his federal constitution claim in state court, or who attempts to raise it in a manner not permitted by state procedural rules is barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Presnell,* 835 F.2d 1567, 1580 (11th Cir.1988). "[W]here a state court correctly applies a procedural default principle of state law, *Sykes* requires the federal court to abide by the state court decision." *Harmon v. Barton,* 894 F.2d 1268, 1270 (11th Cir.), *cert. denied,* 498 U.S. 832, 111 S.Ct. 96, 112 L.Ed.2d 68 (1990).

■ A federal court is not required to honor a state procedural ruling unless the ruling rests on an independent and adequate state ground. *Harris v. Reed,* 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989). Consequently, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Id.* at 263, 109 S.Ct. at 1043. However,

should a state court reach the merits of a claim notwithstanding a procedural default, the federal habeas court is not precluded from considering the merits of the claim. *County Court of Ulster County v. Allen,* 442 U.S. 140, 148–49, 99 S.Ct. 2213, 2220, 60 L.Ed.2d 777 (1979); *Dobbert v. Strickland,* 718 F.2d 1518, 1524 (11th Cir.1983), *cert. denied,* 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). Where it is unclear whether the state court has reached the merits of a claim, problems in applying the independent and adequate state ground doctrine may arise. *Dobbert,* 718 F.2d at 1524. However, as here, where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim. *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10; *Richardson v. Thigpen,* 883 F.2d 895, 898 (11th Cir.1989), *cert. denied,* 492 U.S. 934, 110 S.Ct. 17, 106 L.Ed.2d 631 (1989).

### B. Procedural Default of the *Brady/Giglio* Allegation

■ The record reflects that the state habeas corpus court, focusing primarily upon the 1975 proceedings, stated that the allegation was procedurally barred pursuant to O.C.G.A. § 9–14–51[7] even though the state

---

6. With respect to Petitioner's *Brady/Giglio* allegations the district court stated:

> [T]he record reveals that petitioner was aware of this claim during the first round of direct appeals and habeas proceedings in state court. Petitioner has not established that his failure to raise this claim in his first federal habeas petition was not due to deliberate withholding or excusable neglect and his assertion of this claim constitutes abuse of the writ. (citation omitted)

(Order of June 6, 1989 at 22 n. 10.)
The court went on to consider the evidence and rule in the alternative that:

> Although petitioner may have come forward now with a statement by Brown's attorney that there existed an implicit understanding that Brown would derive some benefit from testifying, such a statement flies in the face of Brown's conviction and sentence. Any implicit understanding that may have existed in this case could not have been sufficient to bring Petitioner's claim within the purview of *Giglio.*

> If there is no agreement or understanding and no particular or tangible benefit afforded the witness, then there is nothing required to be disclosed under *Giglio.* By testifying truthfully against a codefendant, a witness may hope or even expect to receive better treatment at the hands of the state, however, as a matter of law such an expectation does not fall under *Giglio. Id.* at 21.

7. O.C.G.A. § 9–14–51 states in pertinent part:

> All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition. Any grounds not so raised are waived unless the Constitution of the United States or of this state otherwise requires or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition.

habeas court continued and stated that even in the alternative, reaching the merits, the evidence presented by Petitioner did not support the allegation that there existed an agreement.[8] This ruling in the alternative does not have the effect, as Petitioner argues, of blurring the clear determination by the court that the allegation was procedurally barred pursuant to O.C.G.A. § 9–14–51. Rather, this Court finds the ruling evidences the court's thorough examination of the Petitioner's claims.

As the Supreme Court stated, "a state court need not fear reaching the merits of a federal claim in an *alternative* holding." *Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10. "By its very definition, the adequate and independent state ground doctrine rule requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Id.* Thus, the Court observed that "as long as the state explicitly invokes a state procedural bar rule as a separate basis for a decision," an alternative ruling on the merits would not preclude the federal courts from applying the state procedural bar. *Id.*

Our reading of the order reveals that the state court simply commented upon the evidence presented by the Petitioner and then held, in a clear statement, that the allegations were procedurally barred under O.C.G.A. § 9–14–51. Therefore, this Court finds no error in the district court's determination that Petitioner's *Brady/Giglio* allegation concerning the 1975 guilt/innocence trial was procedurally barred.

■ Petitioner also asserts that the prosecution not only violated his rights in 1975, but also committed separate and independent constitutional violations in 1984 by failing to reveal the existence of the alleged understanding to the defense and the jury at Alderman's 1984 resentencing trial. It appears from the record that the state habeas court did not directly address the procedural default related to the 1984 trial but only stated generally that the *Brady/Giglio* claim was procedurally barred. Petitioner failed to raise this allegation on direct appeal from the resentencing trial and did not raise the allegation until the subsequent state habeas corpus proceeding. The district court determined the issue to be subject to procedural default pursuant to O.C.G.A. § 9–14–48(d).[9] Thus, the issue on appeal is whether the district court erred in its finding.

The district court determined that precedent allowed the court to honor what it perceived as a state procedural default.[10] The

---

8. The Butts County habeas court stated:
   Grounds twenty-five, twenty-six, and twenty-seven relate to a claim by petitioner that the state failed to reveal to defense counsel an implicit agreement to the effect that the state would not seek the death penalty against a prosecution witness, John Brown, an accomplice to the murder. (See affidavit of Alex R. Zipperer, III). The proffered evidence does not demonstrate that there was in fact such an agreement. Following petitioner's trial, Brown was tried and convicted and sentenced to death. Respondent argues that these claims are successive in that they could have reasonably been raised in the first habeas corpus action, as the evidence which has been proffered was apparently known to persons outside of the prosecution and discovered by the petitioner. Petitioner has not shown why these claims could not have reasonably been raised in the first habeas corpus action. Therefore, they should be considered was [sic] waived. OCGA Section 9–14–51.
   (Butts County Superior Court Order of September 10, 1987 at 9.)

9. O.C.G.A. § 9–14–48(d) states in pertinent part:
   The court shall review the trial record and transcript of proceedings and consider whether the petitioner made timely motion or objection or otherwise complied with Georgia procedural rules at trial and on appeal; and absent a showing of cause for noncompliance with such requirement, and of actual prejudice, habeas corpus relief shall not be granted.

10. The district court stated:
    The Respondent urges the court to honor the state procedural rule, despite the lack of a direct finding of a procedural bar. There is precedent for the Court to do so. *See Lindsey v. Smith*, 820 F.2d 1137 (11th Cir.1987) (holding that district court correctly applied state law procedural bar to petitioner's jury challenge, despite state court's failure to indicate that its denial of petition rested on procedural grounds, where petitioner never raised facially sufficient jury challenge before any state court and state court's denial of petition could not be construed as a decision on the merits), *cert.*

district court cited this Court's decision in *Collier v. Jones,* 910 F.2d 770 (11th Cir.1990) and applied the state procedural default rule, holding:

> Although the Petitioner raised the *Brady/Giglio* claim at the 1984 trial, the Petitioner did not present the claim on direct appeal as required by O.C.G.A. § 9–14–48(d). O.C.G.A. § 9–14–48(d) was amended in 1982. almost two years before Alderman's resentencing trial, to require compliance with Georgia procedural rules at trial and on appeal as a condition for habeas corpus relief. Georgia courts routinely honor procedural defaults under section 9–14–48(d), and undoubtedly would do so in this case. [Cit.]

> \*　　\*　　\*　　\*　　\*　　\*

> Finally, although the state court did not explicitly mention the 1984 procedural default, the record reflects that the Respondent made this argument to the Butts County habeas court.... Thus, consistent with this Court's finding that the Georgia courts would find Petitioner's claim procedurally defaulted, and in the absence of any evidence to the contrary, the Court may presume that the Butts County habeas court applied the established default rule which was briefed by the Respondent.

(Order entered June 22, 1992, at 23–24.)

This Court finds that the district court was correct in finding that there exists a procedural bar to Appellant's *Brady/Giglio* allegation relating to Appellant's 1984 resentencing trial.

### C. Cause and Prejudice

■ An adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto," or demonstrate that failure to consider the federal claim will result in a " 'fundamental miscarriage of justice.' " *Harris,* 489 U.S. at 262, 109 S.Ct. at 1043 (citations omitted). In

his brief, Petitioner asserts that there exists cause to excuse the defaults and that newly discovered evidence, namely the affidavit of Alex Zipperer, and prosecutorial misconduct caused the delay. Petitioner argues that "cause and prejudice" exist, excusing his failure to raise these claims on direct appeal, therefore, this Court should address the allegation on the merits. However, we agree with the district court's finding that there exists no cause or prejudice to except Petitioner's *Brady/Giglio* allegations from being procedurally barred.

Although the Supreme Court has "declined ... to essay a comprehensive catalog of the circumstances that would justify a finding of cause," *Smith v. Murray,* 477 U.S. 527, 533–34, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986), the Court has made it clear that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). It has been held that state misconduct may constitute grounds for cause. *Amadeo v. Zant,* 486 U.S. 214, 222, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249 (1988); *Dorman v. Wainwright* 798 F.2d 1358, 1370 (11th Cir.1986), *cert. denied sub nom. Dugger v. Dorman,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987).

■ The Supreme Court has recently reiterated, "cause ... requires a showing of some external impediment *preventing* counsel from constructing or raising the claim." *McCleskey v. Zant,* 499 U.S. 467, 497, 111 S.Ct. 1454, 1472, 113 L.Ed.2d 517 (1991), *quoting Murray,* 477 U.S. at 488, 106 S.Ct. at 2645. For cause to exist, the external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim. *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645.

denied, 489 U.S. 1059 [109 S.Ct. 1327, 103 L.Ed.2d 595] (1989); *see also Collier v. Jones,* 910 F.2d 770 (11th Cir.1990); *Ladd v. Jones,* 864 F.2d 108, 109 (11th Cir.), *cert. denied,* 493 U.S. 842 [110 S.Ct. 129, 107 L.Ed.2d 89]

(1989); *Bennett v. Fortner,* 863 F.2d 804, 807–808 (11th Cir.), *cert. denied,* 490 U.S. 1071 [109 S.Ct. 2077, 104 L.Ed.2d 641] (1989). District Court Order entered June 22, 1992 at 21–22.

The requirement of cause in the abuse-of-the-writ context is based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition. *McCleskey*, 499 U.S. at 498, 111 S.Ct. at 1472. "If what petitioner knows or could discover upon reasonable investigation supports a claim for relief ... what he does not know is irrelevant." *Id.* The omission of a claim will not be excused merely because evidence discovered later may have supported or strengthened the claim. *Id.*

Appellant asserts that the prosecution's misconduct was its failure to divulge the existence of a deal between itself and Brown. Appellant further asserts that cause existed because he lacked a good faith factual basis to assert the *Brady/Giglio* claim. The record reflects that Appellant was both aware of the facts he contends support a potential *Brady/Giglio* violation several years before 1987 and that Appellant did nothing to supplement the evidence to support the claim. That Appellant did not possess Zipperer's affidavit fails to establish cause if known or discoverable evidence could have supported the claim.

There is no evidence in the record as to why Mr. Zipperer was not subpoenaed to testify as a witness in the state court habeas proceeding. Furthermore, apart from Petitioner's bare allegation that there was an understanding and that the prosecution failed to disclose the same, Appellant has failed to substantiate his claim with any evidence of governmental interference or misconduct which would have prevented him from raising the claim in a timely fashion. In the absence of such evidence, this Court finds that the district court did not err in holding that Appellant could not establish cause and prejudice to exempt his claim from being procedurally barred. Therefore, we find that the district court correctly determined Appellant's 1975 and 1984 *Brady/Giglio* claims to be procedurally barred.

D. Fundamental Miscarriage of Justice

■ In an extraordinary case, where a petitioner cannot show cause and prejudice,

a federal court may still consider a procedurally defaulted claim if it determines that a fundamental miscarriage of justice has probably occurred. *Johnson v. Singletary*, 938 F.2d 1166, 1182–83 (11th Cir.1991) (*en banc*). A fundamental miscarriage of justice can be said to have occurred when a court finds that a constitutional violation has resulted in the conviction of someone who is actually innocent. *Murray*, 477 U.S. at 496, 106 S.Ct. at 2639; *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1575, 71 L.Ed.2d 783 (1982). This Court has stated that the fundamental miscarriage of justice exception is only available upon a showing of "actual innocence," which we have defined as follows:

> [A] petitioner may make a colorable showing that he is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates *all* of the aggravating factors found to be present by the sentencing body. That is, but for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, that he is *ineligible* for the death penalty.

*Johnson*, 938 F.2d at 1183. One year later, the Supreme Court cited, quoted, condensed and restated the *Johnson* actual innocence test holding that, in order "to show actual innocence one must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, —— U.S. ——, ——, —— & n. 15, 112 S.Ct. 2514, 2517, 2523 & n. 15, 120 L.Ed.2d 269 (1992) (internal quotations deleted).

In our later decision, *Johnson v. Singletary*, 991 F.2d 663, 667–68 (11th Cir.1993), we recognized that the actual innocence exception stated in the *en banc Johnson* decision and the Supreme Court's *Sawyer* decision replaced the old "ends of justice" exception to the abuse of the writ bar. Petitioner's action involves procedural default bars and

abuse of the writ bars, whereas *Johnson* and *Sawyer* involved abuse of the writ bars only. However, the difference does not matter as the Supreme Court has concluded, "from the unity of structure and purpose in the jurisprudence of state procedural defaults and abuse of the writ that the standard for excusing a failure to raise a claim at the appropriate time should be the same in both contexts." *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

In regards to a defaulted sentence stage claim, it is clear that the *Sawyer* formulation of the actual innocence test must be applied because the *Johnson* and *Sawyer* decisions dealt with alleged sentence stage errors. However, in regards to the defaulted guilt stage claims, there is a split of authority. Some habeas petitioners suggest that the *Sawyer* formulation of the actual innocence test applies only to the sentence stage claims while the "colorable showing of innocence" test announced in *Kuhlmann v. Wilson*, 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986) (plurality opinion), is the proper exception to apply to guilt stage claims.[11] *See Schlup v. Delo*, 11 F.3d 738, 740 (8th Cir.1993), *cert. granted,* — U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994); *Montoya v. Collins*, 988 F.2d 11, 13 (5th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 1630, — L.Ed.2d —— (1993).

The Fifth Circuit appears to have held that the *Kuhlmann* formulation applies to guilt stage claims, while the *Sawyer* formulation is restricted in application to sentence stage claims. *Montoya v. Collins*, 988 F.2d at 13. On the other hand, the Eighth Circuit has expressly held that "the more subjective *Kuhlmann* test" is no longer applicable even to guilt stage claims; instead, the *Sawyer* test applies equally to guilt and sentence stage claims. *Schlup*, 11 F.3d at 740, *citing*

*Cornell v. Nix*, 976 F.2d 376 (8th Cir.1992) (en banc), *cert. denied,* — U.S. ——, 113 S.Ct. 1820, 123 L.Ed.2d 450 (1993).

This Circuit has not taken a position on the question of whether the *Kuhlmann* or *Sawyer* version of the actual innocence test is applicable to guilt stage claims. The Supreme Court has recently granted certiorari in the *Schlup* case to decide that very question. *Schlup v. Delo,* — U.S. ——, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994).

Notwithstanding, we conclude that the facts of this case are such that regardless of the Supreme Court's decision as to whether the *Kuhlmann* or the *Sawyer* formulation of the actual innocence test applies, the decision we reach today will be the same. This petitioner has not made a sufficient showing of actual innocence under either the *Kuhlmann* or the *Sawyer* test. Therefore, we hold that petitioner is not entitled to the benefit of the fundamental miscarriage of justice exception to overcome the procedural or abuse of writ bars against his allegations.

### E. *Brady/Giglio* on the Merits

■ Although this Court finds Appellant's 1975 and 1984 *Brady/Giglio* issues to be procedurally barred, we feel it necessary to briefly discuss the merits of the claim and the district court's factual findings. Appellant asserts that the state entered into an implicit understanding with John Brown that he would receive a life sentence in return for his testimony at Appellant's trial. Appellant contends that the prosecution's failure to disclose the alleged deal violates *Brady/Giglio* and constitutes prosecutorial misconduct.

■ A prosecutor has a duty to provide a defendant with all evidence in the state's possession materially favorable to the defendant's defense. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196. When the defendant's guilt

11. The *Kuhlmann* plurality opinion, which came six years before the *Sawyer* decision, applied a "colorable showing of innocence" test to an otherwise barred guilt stage claim. 477 U.S. at 452–54, 106 S.Ct. at 2626–27. The opinion defined that test as follows:

the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with

the due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt." 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17, *quoting* Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 39 U.Chi. L.Rev. 142, 160 (1970).

or innocence may turn on the reliability of a witness, the prosecutor's nondisclosure of the evidence affecting the credibility of this witness falls within this general rule. *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177. Promises made by the state to a witness in exchange for his testimony relate directly to the credibility of the witness. *Giglio*, 405 U.S. at 155, 92 S.Ct. at 766. Therefore, where the credibility of the witness is an important issue in the case, without which there could have been no indictment and no evidence to carry the case, the prosecutor has a duty to disclose evidence of any promises made by the state to such a witness in exchange for his testimony. *Id.* at 154–55, 92 S.Ct. at 766.

As this Circuit has explained, "*Giglio* does not require that the word 'promise' is a word of art that must be specifically employed." *Brown v. Wainwright*, 785 F.2d 1457, 1464–65 (11th Cir.1986). Nor is the phrase "any understanding or agreement" limited to bona fide enforceable grants of immunity. *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir.1985). "Even mere 'advice' by a prosecutor concerning the future prosecution of a key government witness may fall into the category of discoverable evidence since it constitutes an informal understanding which could directly affect the witness's credibility before the jury." *Id.* This Circuit has emphasized that "the thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony." *McCleskey v. Kemp*, 753 F.2d 877, 884 (11th Cir.1985) (*en banc*),

*aff'd on other grounds,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), *quoting Smith v. Kemp,* 715 F.2d 1459, 1467 (11th Cir.), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983).

On remand from this Court, the district court conducted a evidentiary hearing concerning whether there was an understanding, agreement or promise between Brown and the state within the meaning of *Giglio*. After conducting the evidentiary hearing and receiving the testimony of John Brown by deposition, the district court found that the claim was procedurally defaulted, an abuse of the writ, or in the alternative without merit.

Having reviewed the evidence, the district court made specific credibility and factual findings which are entitled to be reviewed under the clearly erroneous standard.[12] *Trust Co. Bank v. MGM/UA Entertainment Co.,* 772 F.2d 740, 746 (11th Cir.1985). The court found, "that whatever impression Zipperer may have had or communicated to Brown, it did not serve as the motivating factor for Brown's testifying against the Petitioner." (R4–85–36). The district court further found that, "Brown's testimony was not shaded or influenced by any deals with the prosecution. By his own admission, Brown refused to entertain any suggestion of a guilty plea until after he was sentence (sic) to death. (Brown Dep. at 7)" (R4–85–36).

■ The rule announced in *Giglio* is clear and dispositive of the instant issue. The rule

---

12. The court considered the testimony of three key witnesses. Lionel Drew (now Judge Drew), former chief prosecutor in the trial of John Brown and Jack Alderman, stated that he intended to seek the death penalty in Brown's case and never had or heard of any discussions of a possible plea bargain in exchange for a life sentence prior to Brown's trial. Andrew J. Ryan III, the former assistant district attorney, stated that "there was no discussion with anyone concerning John Brown being given any type of benefit for his testimony in Mr. Alderman's trial." (R5–95). The testimony of Brown's own attorney, Alex Zipperer, further supported that there existed no deal. As summarized by the district court, "[a]s all parties agree, and as Zipperer acknowledged in his testimony, Ryan informed Zipperer that the district attorney's office would not engage in any written plea agreement, enforceable promise, or even tell him verbally that the state would do anything in particular for John Brown.

(R5–13). Zipperer stated, however, that he "was given the clear impression that if my client should decide to testify for the State, testify truthfully against Jack Alderman, that the District Attorney would certainly appreciate that fact and that I could expect to have—be in a better position to negotiate [a] plea for life imprisonment after the Alderman trial." (R5–14). Zipperer, however, could not recall that "he [Ryan] said that in those words" or "recall anything in particular that accounted for [his impression]." (R5–14, 34). In sum, Zipperer felt that there was not any type of understanding that his client, would, in fact receive a life sentence if he testified—only that Brown's testimony might be helpful down the road in facilitating plea negotiations should those arise. As Zipperer explained to the Court, "I am certain that I thought at the time that I would have a much better chance of doing that than I would have if he did not testify." (R5–16).

states that there must be a full disclosure of any agreements entered into between the prosecutor and the witness which may motivate the witness to testify and which may affect the outcome of the trial. The rule does not address nor require the disclosure of all factors which may motivate a witness to cooperate. The simple belief by a defense attorney that his client may be in a better position to negotiate a reduced penalty should he testify against a codefendant is not an agreement within the purview of *Giglio*.

The district court's findings are supported by the record. The record indicates that there was no understanding in exchange for or motivating John Brown's testimony. "Any impression formed by Zipperer was nothing more than a lawyer's hope that his client would come to his senses and allow him to enter plea negotiations with the district attorney, and a criminal defense attorney's expectation that the fact that Brown had testified would provide him with an entree in plea negotiations." (R4–85–41). The record fully supports the district court's finding of no promise, understanding or agreement that would fall within the parameters of the rule announced in *Giglio*.

This Court further finds that there is nothing in the record to support Petitioner's assertion of prosecutorial misconduct or other violation of Petitioner's rights in order to exempt Petitioner's claims from procedural default. Therefore, we find Petitioner's allegations to be procedurally barred and state in the alternative that were we to reach the merits, Appellant would be unsuccessful. Where there is, in fact, no agreement, there is no duty to disclose.

## II. Evidentiary Rulings

Appellant asserts that the trial judge erred in excluding certain alleged mitigating evidence from the guilt/innocence phase of the 1975 trial, the penalty phase of the 1975 trial, and the 1984 resentencing hearing. Appellant focuses his claim on two specific evidentiary rulings, namely, (1) the alleged limita-

tions placed on the testimony of both Dr. Herbert Smith and himself regarding his hypnotic treatment, and (2) the exclusion of a statement purportedly made by Jon Sato ("Sato"). This Court finds that the trial court did not err in its exclusion of evidence and testimony pertaining to the hypnosis of the Appellant, nor did the 1984 resentencing court err in excluding Sato's proffered statement.

As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence. *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941); *Osborne v. Wainwright*, 720 F.2d 1237, 1238 (11th Cir.1983). However, where a state court's ruling is claimed to have deprived a defendant of his right to due process, a federal court should then "inquir[e] only to determine whether the error was of such magnitude as to deny fundamental fairness to the criminal trial...." *Osborne*, 720 F.2d at 1238, *quoting Hills v. Henderson*, 529 F.2d 397, 401 (5th Cir.), *cert. denied sub nom. Hills v. Maggio*, 429 U.S. 850, 97 S.Ct. 139, 50 L.Ed.2d 124 (1976).[13] When reviewing state evidentiary rulings, the established standard is that habeas relief will only be granted if the state trial error was material as regards a critical, highly significant factor. *McCoy v. Newsome*, 953 F.2d 1252, 1256 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2283, 119 L.Ed.2d 208 (1992) (citations omitted).

### A. The *Rock*[14] Issue

At Appellant's original trial, Appellant sought to introduce testimony concerning his hypnotic treatment. The trial court instructed counsel for both parties to avoid all references to the hypnotic treatment of the Appellant relying upon *Emmett v. State*, 232 Ga. 110, 205 S.E.2d 231, 235 (1974) (The Supreme Court of Georgia concluded that

---

**13.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent those cases decided in the Fifth Circuit prior to October 1, 1981.

**14.** *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

according to state law, the reliability of testimony while under hypnosis had not been established; therefore, statements made while the witness was in a trance were inadmissible).

On direct appeal, the Supreme Court of Georgia concluded that under state law, "any reference to the hypnosis of the appellant was inadmissible, and, therefore, the trial court did not err in refusing defense counsel's request to examine their expert witness concerning this matter." *Alderman v. State*, 246 S.E.2d at 651. Our review of the record reveals that the district court did not err in finding that the narrow exclusion of any reference to the word hypnosis or any statements made by Petitioner while in a hypnotic trance did not deny Petitioner a fundamentally fair trial.

In support of his allegation, Appellant mistakenly relies upon the Supreme Court decision in *Rock*.[15] The issue before the Court in *Rock* was "whether a criminal defendant's right to testify may be restricted by a state rule that excludes her *posthypnosis* testimony." *Rock*, 483 U.S. at 53, 107 S.Ct. at 2710. (emphasis added). In *Rock*, the trial judge held a pretrial hearing on the motion to exclude petitioner's testimony and concluded that no hypnotically refreshed testimony would be admitted. The court limited the Petitioner's testimony to the matters remembered and stated to the examiner prior to her being placed under hypnosis. The Supreme Court ruled that Arkansas' *per se* rule excluding all posthypnosis testimony infringes

impermissibly on the right of a defendant to testify on his/her own behalf. *Id.* at 61, 107 S.Ct. at 2714. This holding in *Rock* is completely inapplicable to the issue raised by the Appellant and is therefore neither binding nor persuasive.

In the instant case, the court allowed Appellant to testify about his amnesia and about his medical treatment by Dr. Smith. The court permitted Appellant to testify as to his hypnotically refreshed recollection of the events of the day and night of his wife's death. The court also allowed Dr. Smith to testify that he had refreshed Mr. Alderman's memory by acceptable scientific means and was later cross-examined by the state about the practice of hypnosis. It appears that the court only ruled that neither party could refer to the word hypnosis in relation to the Appellant and could not introduce statements made while Appellant was in a hypnotic trance. All other testimony was seemingly admitted. We agree with the district court's determination, and find that the exclusion did not deprive Appellant of a fundamentally fair trial.

### B. The Sato Statement

■ The second part of Appellant's third allegation focuses on the exclusion of evidence at Appellant's 1984 resentencing trial pertaining to a statement purportedly made by Sato. The record reveals that Appellant only proffered his testimony of what Sato said Brown had told him.[16] At the time of the resentencing, Jon Sato could not be locat-

---

**15.** We find no merit in Appellant's constitutional challenge to the court's exclusion of Dr. Smith's testimony concerning Appellant's hypnosis. We find that the constitutional right to testify on one's own behalf is just that. Furthermore, *Rock* specifically states, "[t]his case does not involve the admissibility of testimony of previously hypnotized witnesses other than criminal defendants and we express no opinion on that issue." *Rock*, 483 U.S. at 58 n. 15, 107 S.Ct. at 2712 n. 15. Therefore, we only find it necessary to review whether any constitutional violation was occasioned by the court's exclusion of Appellant's testimony concerning hypnosis.

**16.** The following colloquy took place outside the jury's presence:

COURT: What do you want to put in evidence?
MR. JACKSON: I wanted [Alderman] to recount what John Sato told him.
COURT: Told him.
MR. JACKSON: Right.
COURT: And stop there?
MR. JACKSON: What he told him; right.
COURT: Well, that's what I'll concentrate my—
MR. JACKSON: And if we don't want to mess with the written statement, that's fine. We can just go with—I thought that way there'd be some parameters that the D.A. could see—'cause that's already—
(1984 Resentencing Trial transcript, Vol. 5, p. 1140)

ed. The court summarized the issue before it stating:

> I want to be sure that we have an understanding of the factual background. It's my understanding that Mr. Alderman contends that a prisoner in the Chatham County Jail named Sato told him something that John Brown allegedly told Sato.... That this conversation took place—and all of these conversations took place—several months after the trial, conviction, and sentencing of John Brown, as well as Alderman.... That you have made an effort to locate Mr. Sato? ... It's nine years, and you have been unable to find him.

(1984 Resentencing Trial transcript Vol. 6, p. 1248–49)

The court then ruled that Mr. Alderman would not be allowed to testify as to the alleged conversation he had with Sato concerning what Sato contends he was told by Mr. Brown.[17] However, Appellant was allowed to go on the stand, make a proffer, and allowed to identify the statement.[18]

It is generally true that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant's character, record or the circumstances of the particular offense. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978). However, a judge still retains the discretion to exclude otherwise inadmissable evidence which it determines lacks considerable assurances of trustworthiness. *Chambers*, 410 U.S. at 300, 93 S.Ct. at 1048.

Therefore, we agree with the district court's finding that the trial court did not abuse its discretion in excluding the alleged Sato statement, and further that no adverse constitutional implications arose from the exclusion of such evidence.[19]

### III. Denial of Motion for Continuance

Appellant asserts that he was deprived of his Fifth, Eighth and Fourteenth Amendment rights to a fair trial, as well as

---

17. The trial court took great care in ruling on the evidentiary matter stating:

    > All right, this will be my ruling and my reasons therefor. The defendant relies on *Green v. Georgia*, [442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979),] a United States Supreme Court case, which he states is precedent for allowing him to testify as to what another prisoner named Sato told him concerning an alleged conversation that Sato had with John Brown. Now, this is double hearsay and there's no question but that it would not have been admissible under the rules of evidence on the guilt or innocence phase of this trial. The defendant contends that the rules are more lax or liberal on the sentencing phase of a case of this nature and he cites *Green*. Now, I've carefully analyzed the *Green* case and also *Chambers v. Mississippi*, [410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)] which *Green* cites. The real question before me, as I see it, is whether or not we have any rules of evidence in the sentencing phase of a death penalty case so far as the defendant is concerned. Now, *Green* takes a step toward this point of view, but a careful analysis of *Green* convinces me that it is only a step and only under certain circumstances. The *Green* court states, and I quote in part: In these unique circumstances, the hearsay rule may not be applied mechanistically to defeat the ends of justice. End quote.... I do not believe that this proposed evidence can be classified as having the, quote, persuasive assurance of

    trustworthiness, end quote, as the *Chambers* case requires.... It would appear to me that under these circumstances the State should have every opportunity to cross-examine Mr. Sato. Therefore, I do not believe that the U.S. Supreme Court intended to do away with all rules of evidence in the sentencing phase of a death penalty case nor do I believe that the evidence sought to be introduced in this case meets the test that was set down in *Green* and *Chambers*.

    *Id.* at 1249–52.

18. Appellant's attorney stated:

    > Your Honor, for purposes of this hearing we'd ask that a copy of this be included in this record; however, we're not, as we advised the Court yesterday, planning on introducing the document itself. This is just to verify Mr. Alderman's contentions that this individual did make this statement.

    *Id.* at 1257.

19. Even if we were to find that the resentencing court erred in the exclusion of such evidence, this action would not have risen to the magnitude so as to deny Appellant a fundamentally fair criminal trial. *Nettles v. Wainwright*, 677 F.2d 410, 414–15 (5th Cir. Unit B 1982), *quoting Hills*, 529 F.2d at 401. The record reveals that a similar statement exculpating Alderman was admitted into evidence. Thus, this facet of Appellant's defense was presented to the jury.

his Sixth, Eighth and Fourteenth Amendment rights to effective assistance of counsel and his Fifth Amendment right to compulsory process, by the trial court's denial of his Motion for Continuance prior to his original 1975 trial. The motion was based upon the alleged unavailability of witness, Iris Duncan.[20] The district court held, and we affirm, that no constitutional violations were occasioned by the trial court's denial of Appellant's Motion for Continuance.

■ When an individual is asserting a denial of a continuance as a basis for habeas corpus relief there must be a showing of an abuse of discretion and that the trial court's actions were so arbitrary as to result in the denial of due process. *Hicks v. Wainwright,* 633 F.2d 1146, 1148 (5th Circ. Unit B 1981). Trial courts are afforded broad discretion in determining whether a continuance should be granted. *Morris v. Slappy,* 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *Corbin v. State,* 212 Ga. 231, 91 S.E.2d 764, 766, *cert. denied,* 351 U.S. 987, 76 S.Ct. 1057, 100 L.Ed. 1501 (1956); *Gallimore v. State,* 166 Ga.App. 601, 305 S.E.2d 164 (1983). There is no particular mechanistic device for determining whether the denial of a continuance results in a violation of due process. *Unger v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849–50, 11 L.Ed.2d 921 (1964). The answer must be derived from the circumstances of the particular case, especially the reasons presented to the trial judge at the time the request is denied. *Id.*

There is no evidence that the trial court abused its discretion in denying the Appellant's motion for a continuance.[21] Nor is there any evidence that the denial of a continuance was arbitrary as to result in the denial of due process. Therefore, we find that no constitutional violation was occasioned by the trial court's denial of appellant's motion for continuance.

## IV. Sufficiency of Evidence

Appellant challenges the verdict stating that the evidence did not support a finding of the seventh statutory aggravating circumstance. We, like the district court, disagree. We find that the state court, the state supreme court and the district court properly found that there was sufficient evidence to support a finding of Georgia's (b)(7) statutory aggravating circumstance, namely that the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. Therefore, we agree with the district court finding that no federal constitutional deprivation was occasioned and that there was sufficient evidence to corroborate the testimony of Brown.

## CONCLUSION

Based upon the foregoing discussion, and for the reasons stated in the district court's dispositive orders regarding those issues enumerated in footnote 4, *supra,* we AFFIRM the district court's denial of relief.

AFFIRMED.

---

20. At trial, Appellant's attorney stated, "I would like to make a formal request for a continuance because the witness is a viable [sic] witness to the case; however, the witness has not been served." 1975 Trial Transcript, Voir Dire, p. 3–4. Appellant now asserts that the denial of the motion precluded him from considering possible challenges to the grand and traverse jury. As this was not the basis for the motion at trial, it will not be considered here.

21. On review, the Supreme Court of Georgia observed that the Appellant failed to comply with the Georgia statutory requirements for obtaining a continuance and found no error or abuse of discretion. *Alderman,* 246 S.E.2d at 647.